AMANDA ACQUISITION CORPORATION, Plaintiff–Appellant/ Cross–Appellee,

v.

UNIVERSAL FOODS CORPORATION, et al.,

Defendants–Appellees/Cross–Appellants.

Nos. 89–1581 and 89–1712.

United States Court of Appeals, Seventh Circuit.

Argued April 17, 1989.

Decided May 24, 1989.

Michael B. Apfeld, William H. Levit, Jr., Godfrey & Kahn, Milwaukee, Wis., Gregory P. Joseph, Stephen Lew, Honey L. Leichner, Claire S. Hancock, Michael C. Cooper, Eric S. Sherby, Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff-appellant.

John R. Dawson, David E. Beckwith, Michael Fischer, Maureen A. McGinnity, Michael P. Van Alstine, Foley & Lardner, Milwaukee, Wis., Michael Schwartz, Barbara Robbins, Peter C. Hein, William C. Sterling, Richard H. Weiss, Robert A. Ragazzo, Stephen R. Neuwirth, Wachtell, Lipton, Rosen & Katz, New York City, Jonathan I. Blackman, Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants-appellees.

Donald J. Hanaway, Atty. Gen., Daniel D. Stier, Asst. Atty. Gen., Office of the Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis., for intervenor.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and WILL, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

States have enacted three generations of takeover statutes in the last 20 years. Illinois enacted a first-generation statute, which forbade acquisitions of any firm with substantial assets in Illinois unless a public official approved. We concluded that such a statute injures investors, is preempted by the Williams Act, and is unconstitutional under the dormant Commerce Clause. *MITE Corp. v. Dixon*, 633 F.2d 486 (7th Cir.1980). The Supreme Court affirmed the judgment under the Commerce Clause, *Edgar v. MITE Corp.*, 457 U.S. 624, 643–46, 102 S.Ct. 2629, 2641–43, 73 L.Ed.2d 269 (1982). Three Justices also agreed with our view of the Williams Act, *id.* at 634–40, 102 S.Ct. at 2636–39 (White, J., joined by Burger, C.J. & Blackmun, J.), while two

disagreed, *id.* at 646–47, 102 S.Ct. at 2642–43 (Powell, J.), and 655, 102 S.Ct. at 2647 (Stevens, J.), and four did not address the subject.

Indiana enacted a second-generation statute, applicable only to firms incorporated there and eliminating governmental veto power. Indiana's law provides that the acquiring firm's shares lose their voting power unless the target's directors approve the acquisition or the shareholders not affiliated with either bidder or management authorize restoration of votes. We concluded that this statute, too, is inimical to investors' interests, preempted by the Williams Act, and unconstitutional under the Commerce Clause. *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250 (7th Cir.1986). This time the Supreme Court did not agree. It thought the Indiana statute consistent with both Williams Act and Commerce Clause. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Adopting Justice White's view of preemption for the sake of argument, *id.* at 81, 107 S.Ct. at 1645, the Court found no inconsistency between state and federal law because Indiana allowed the bidder to *acquire* the shares without hindrance. Such a law makes the shares less attractive, but it does not regulate the process of bidding. As for the Commerce Clause, the Court took Indiana's law to be regulation of internal corporate affairs, potentially beneficial because it would allow investors to avoid the "coercion" of two-tier bids and other tactics. 481 U.S. at 83, 91–93, 107 S.Ct. at 1646, 1650–51. Justices White, Blackmun, and Stevens disagreed with the analysis under the Commerce Clause, *id.* at 99–101, 107 S.Ct. at 1655–56; only Justice White disagreed with the conclusion about preemption, *id.* at 97–99, 107 S.Ct. at 1653–55.

Wisconsin has a third-generation takeover statute. Enacted after *CTS*, it postpones the kinds of transactions that often follow tender offers (and often are the reason for making the offers in the first place). Unless the target's board agrees to

[*] Hon. Hubert L. Will, of the Northern District of Illinois, sitting by designation.

the transaction in advance, the bidder must wait three years after buying the shares to merge with the target or acquire more than 5% of its assets. We must decide whether this is consistent with the Williams Act and Commerce Clause.

## I

Amanda Acquisition Corporation is a shell with a single purpose: to acquire Universal Foods Corporation, a diversified firm incorporated in Wisconsin and traded on the New York Stock Exchange. Universal is covered by Wisconsin's anti-takeover law. Amanda is a subsidiary of High Voltage Engineering Corp., a small electronics firm in Massachusetts. Most of High Voltage's equity capital comes from Berisford Capital PLC, a British venture capital firm, and Hyde Park Partners L.P., a partnership affiliated with the principals of Berisford. Chase Manhattan Bank has promised to lend Amanda 50% of the cost of the acquisition, secured by the stock of Universal.

In mid-November 1988 Universal's stock was trading for about $25 per share. On December 1 Amanda commenced a tender offer at $30.50, to be effective if at least 75% of the stock should be tendered.[1] This all-cash, all-shares offer has been increased by stages to $38.00.[2] Amanda's financing is contingent on a prompt merger with Universal if the offer succeeds, so the offer is conditional on a judicial declaration that the law is invalid. (It is also conditional on Universal's redemption of poison pill stock. For reasons that we discuss below, it is unnecessary to discuss the subject in detail.)

No firm incorporated in Wisconsin and having its headquarters, substantial operations, or 10% of its shares or shareholders there may "engage in a business combination with an interested stockholder ... for 3 years after the interested stockholder's stock acquisition date unless the board of directors of the [Wisconsin] corporation has approved, before the interested stockholder's stock acquisition date, that business combination or the purchase of stock", Wis. Stat. § 180.726(2). An "interested stockholder" is one owning 10% of the voting stock, directly or through associates (anyone acting in concert with it), § 180.726(1)(j). A "business combination" is a merger with the bidder or any of its affiliates, sale of more than 5% of the assets to bidder or affiliate, liquidation of the target, or a transaction by which the target guarantees the bidder's or affiliates debts or passes tax benefits to the bidder or affiliate, § 180.726(1)(e). The law, in other words, provides for almost hermetic separation of bidder and target for three years after the bidder obtains 10% of the stock—unless the target's board consented before then. No matter how popular the offer, the ban applies: obtaining 85% (even 100%) of the stock held by non-management shareholders won't allow the bidder to engage in a business combination, as it would under Delaware law. See *BNS, Inc. v. Koppers Co.*, 683 F.Supp. 458 (D.Del. 1988); *RP Acquisition Corp. v. Staley Continental, Inc.*, 686 F.Supp. 476 (D.Del. 1988); *City Capital Associates L.P. v. Interco, Inc.*, 696 F.Supp. 1551 (D.Del.), affirmed, 860 F.2d 60 (3d Cir.1988). Wisconsin firms cannot opt out of the law, as may corporations subject to almost all other state takeover statutes. In Wisconsin it is management's approval in advance, or wait three years. Even when the time is up, the bidder needs the approval of a majority of the remaining investors, without any provision disqualifying shares still held by the managers who resisted the transaction,

---

1. Wisconsin has, in addition to § 180.726, a statute modeled on Indiana's, providing that an acquiring firm's shares lose their votes, which may be restored under specified circumstances. Wis.Stat. § 180.25(9). That law accounts for the 75% condition, but it is not pertinent to the questions we resolve.

2. Universal contends that an increase after the district court's opinion makes the case moot, or at least requires a remand. It does not. The parties remain locked in combat. Price has no effect on the operation of the Wisconsin law, and as that is the sole issue we shall decide there is no need to remand for further proceedings.

§ 180.726(3)(b).[3] The district court found that this statute "effectively eliminates hostile leveraged buyouts". As a practical matter, Wisconsin prohibits any offer contingent on a merger between bidder and target, a condition attached to about 90% of contemporary tender offers.

Amanda filed this suit seeking a declaration that this law is preempted by the Williams Act and inconsistent with the Commerce Clause. It added a pendent claim that the directors' refusal to redeem the poison-pill rights violates their fiduciary duties to Universal's shareholders. The district court declined to issue a preliminary injunction. 708 F.Supp. 984 (E.D. Wis.1989). It concluded that the statute is constitutional and not preempted, and that under Wisconsin law (which the court believed would follow Delaware's) directors are entitled to prevent investors from accepting tender offers of which the directors do not approve.[4] Amanda prevailed on one issue, however: the court held that Universal does not have a private right of action to enforce the margin regulations issued by the Federal Reserve Board, and it therefore declined to consider Universal's argument that Amanda had arranged to borrow more than 50% of the cost of its bid.

As a practical matter, the decision denying preliminary relief ends the case. The parties treat their appeals as if taken from the conclusive denial of relief; so shall we. The financial stakes on both sides cancel out, and the question becomes who is right on the merits. *CTS,* 794 F.2d at 252; see also *FTC v. Elders Grain, Inc.,* 868 F.2d 901, 903–05 (7th Cir.1989). The parties ask us to decide whether Universal has a private right of action to enforce the margin rules, whether Universal's directors violated their fiduciary duties under Delaware law (or Wisconsin law if it differs) in refusing to redeem the poison pill rights, and whether § 180.726 is consistent with the Constitution and federal law.

## II

Courts try to avoid constitutional adjudication. There is no escape for us today, however. Even if we were to conclude that Universal has a private right of action and that its board acted within its rights in refusing to redeem the poison pill, we would have to reach the constitutional question. Amanda is entitled to attack each hurdle in its path. Although the poison pill *might* be an insuperable obstacle if the statute were held invalid, Amanda may gain from having one fewer stumbling block, which gives it standing to protest the statute independently of the pill. See *Larson v. Valente,* 456 U.S. 228, 238–43, 102 S.Ct. 1673, 1680–82, 72 L.Ed.2d 33 (1982); *Tyson Foods, Inc. v. McReynolds,* 865 F.2d 99, 101 (6th Cir.1989). The reverse is not true, however. At oral argument counsel for Amanda said that if the statute is within Wisconsin's powers, then its offer is doomed. So starting with the

---

**3.** Acquirors can avoid this requirement by buying out the remaining shareholders at a price defined by § 180.726(3)(c), but this is not a practical option.

**4.** The district court's explanation of its holding is more limited, because it said that the directors might have foreseen three "threats" in this all-cash, all-shares premium offer: a threat that the merger would not occur, leaving some investors locked into a minority position; a threat that the papers filed under the Williams Act "might" contain false information, and a "threat to the corporation itself" in the sense that Amanda might change Universal's business plans. Such "threats" are present in all tender offers. If they are enough to justify defensive tactics, then managers are entitled to "just say no" to tender offers. Nothing in this opinion endorses the district court's rationale concerning these "threats", which is in tension with

recent Delaware cases. *City Capital Associates L.P. v. Interco, Inc.,* 551 A.2d 787 (Del.Ch.1988); *Grand Metropolitan, PLC v. Pillsbury Co.,* 1988 WL 156351, 1988 Del.Ch. LEXIS 158 (Del.Ch. 1988); *MAI Basic Four, Inc. v. Prime Computer, Inc.,* 1988 WL 140221, 1988 Del.Ch. LEXIS 161 (Del.Ch.1988). In responding to a tender offer directors must exercise "the most scrupulous adherence to ordinary standards of fairness in the interest of promoting the highest values reasonably attainable for the stockholders' benefit." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1264 (Del.1989). A policy denying investors the opportunity to accept a substantial premium, based on remote "threats", is not easy to square with the law of Delaware. See also Ronald J. Gilson & Reinier Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?,* 44 Bus.Law. 247, 256–60, 267–73 (1989).

statute holds out the prospect of avoiding some issues, while starting with private rights of action or directors' duties would not enable us to avoid the constitutional question. If we conclude that § 180.726 is within Wisconsin's power, the offer is defunct, and it would be unnecessary to decide whether targets have a private right of action to enforce the margin rules or whether Universal's directors had to redeem the poison pill. We begin, therefore, by considering whether Wis.Stat. § 180.726 conflicts with the Williams Act or the Commerce Clause.

### A

If our views of the wisdom of state law mattered, Wisconsin's takeover statute would not survive. Like our colleagues who decided *MITE* and *CTS*, we believe that antitakeover legislation injures shareholders.[5] *MITE*, 633 F.2d at 496–98 and 457 U.S. at 643–44, 102 S.Ct. at 2641–42; *CTS*, 794 F.2d at 253–55. Managers frequently realize gains for investors via voluntary combinations (mergers). If gains are to be had, but managers balk, tender offers are investors' way to go over managers' heads. If managers are not maximizing the firm's value—perhaps because they have missed the possibility of a synergistic combination, perhaps because they are clinging to divisions that could be better run in other hands, perhaps because they are just not the best persons for the job—a bidder that believes it can realize more of the firm's value will make investors a higher offer. Investors tender; the bidder gets control and changes things. Michael Bradley, Anand Desai & E. Han

Kim, *Synergistic Gains from Corporate Acquisitions and Their Division Between the Stockholders of Target and Acquiring Firms,* 21 J.Fin.Econ. 3 (1988). The prospect of monitoring by would-be bidders, and an occasional bid at a premium, induces managers to run corporations more efficiently and replaces them if they will not.

Premium bids reflect the benefits for investors. The price of a firm's stock represents investors' consensus estimate of the value of the shares under current and anticipated conditions. Stock is worth the present value of anticipated future returns —dividends and other distributions. Tender offers succeed when bidders offer more. Only when the bid exceeds the value of the stock (however investors compute value) will it succeed. A statute that precludes investors from receiving or accepting a premium offer makes them worse off. It makes the economy worse off too, because the higher bid reflects the better use to which the bidder can put the target's assets. (If the bidder can't improve the use of the assets, it injures itself by paying a premium.)

Universal, making an argument common among supporters of anti-takeover laws, contends that its investors do not appreciate the worth of its business plans, that its stock is trading for too little, and that if investors tender reflexively they injure themselves. If only they would wait, Universal submits, they would do better under current management. A variant of the argument has it that although smart investors know that the stock is underpriced, many investors are passive and will tender; even the smart investors then must tender

---

**5.** Because both the district court and the parties —like the Williams Act—examine tender offers from the perspective of equity investors, we employ the same approach. States could choose to protect "constituencies" other than stockholders. Creditors, managers, and workers invest human rather than financial capital. But the limitation of our inquiry to equity investors does not affect the analysis, because no evidence of which we are aware suggests that bidders confiscate workers' and other participants' investments to any greater degree than do incumbents—who may (and frequently do) close or move plants to follow the prospect of profit. Joseph A. Grundfest, a Commissioner of

the SEC, showed in *Job Loss and Takeovers,* address to University of Toledo College of Law, Mar. 11, 1988, that acquisitions have no logical (or demonstrable) effect on employment. See also Brown & Medoff, *The Impact of Firm Acquisitions on Labor,* in *Corporate Takeovers: Causes and Consequences* 9 (A. Auerbach ed. 1988); Roberta Romano, *The Future of Hostile Takeovers: Legislation and Public Opinion,* 57 U.Cin.L.Rev. 457 (1988); C. Steven Bradford, *Protecting Shareholders from Themselves? A Policy and Constitutional Review of a State Takeover Statute,* 67 Neb.L.Rev. 459, 529–34 (1988).

to avoid doing worse on the "back end" of the deal. State laws giving management the power to block an offer enable the managers to protect the investors from themselves.

Both versions of this price-is-wrong argument imply: (a) that the stock of firms defeating offers later appreciates in price, topping the bid, thus revealing the wisdom of waiting till the market wises up; and (b) that investors in firms for which no offer is outstanding gain when they adopt devices so that managers may fend off unwanted offers (or states adopt laws with the same consequence). Efforts to verify these implications have failed. The best available data show that if a firm fends off a bid, its profits decline, and its stock price (adjusted for inflation and market-wide changes) never tops the initial bid, even if it is later acquired by another firm. Gregg A. Jarrell, James A. Brickley & Jeffrey M. Netter, *The Market for Corporate Control: The Empirical Evidence Since 1980*, 2 J.Econ. Perspectives 49, 55 (1988) (collecting studies); John Pound, *The Information Effects of Takeover Bids and Resistance*, 22 J.Fin.Econ. 207 (1988). Stock of firms adopting poison pills falls in price, as does the stock of firms that adopt most kinds of anti-takeover amendments to their articles of incorporation. Jarrell, Brickley & Netter, 2 J.Econ. Perspectives at 58–65 (collecting studies); Michael C. Jensen, *Takeovers: Their Causes and Consequences*, 2 J.Econ. Perspectives 21, 25–28, 41–45 (1988); Michael Ryngaert, *The Effect of Poison Pill Securities on Shareholder Wealth*, 20 J.Fin.Econ. 377 (1988); cf. John Pound, *The Effects of Antitakeover Amendments on Takeover Activity: Some Direct Evidence*, 30 J.L. & Econ. 353 (1987). Studies of laws similar to Wisconsin's produce the same conclusion: share prices of firms incorporated in the state drop when the legislation is enacted. Jonathan M. Karpoff & Paul H. Malatesta, *The Wealth Effects of Second Generation State Takeover Legislation*, University of Washington Graduate School of Business Working Paper (Dec. 22, 1988).

Although a takeover-*proof* firm leaves investors at the mercy of incumbent managers (who may be mistaken about the wisdom of their business plan even when they act in the best of faith), a takeover-*resistant* firm may be able to assist its investors. An auction may run up the price, and delay may be essential to an auction. Auctions transfer money from bidders to targets, and diversified investors would not gain from them (their left pocket loses what the right pocket gains); diversified investors would lose from auctions if the lower returns to bidders discourage future bids. But from targets' perspectives, once a bid is on the table an auction may be the best strategy. The full effects of auctions are hard to unravel, sparking scholarly debate.[6] Devices giving managers some ability to orchestrate investors' responses, in order to avoid panic tenders in response to front-end-loaded offers, also could be beneficial, as the Supreme Court emphasized in *CTS*, 481 U.S. at 92–93, 107 S.Ct. at 1651–52. ("Could be" is an important qualifier; even from a perspective limited to targets' shareholders given a bid on the table, it is important to know whether managers use this power to augment bids or to stifle them, and whether courts can tell the two apart.)

State anti-takeover laws do not serve these ends well, however. Investors who prefer to give managers the discretion to orchestrate responses to bids may do so through "fair-price" clauses in the articles of incorporation and other consensual devices. Other firms may choose different

6. Compare Lucian Arye Bebchuk, *Toward Undistorted Choice and Equal Treatment in Corporate Takeovers*, 98 Harv.L.Rev. 1693 (1985), and Ronald J. Gilson, *Seeking Competitive Bids versus Pure Passivity in Tender Offer Defense*, 35 Stan.L.Rev. 51 (1982), with Alan Schwartz, *Search Theory and the Tender Offer Auction*, 2 J.L., Econ. & Org. 229 (1986), and Sanford J. Grossman & Oliver D. Hart, *Takeover Bids, the Free–Rider Problem and the Theory of the Corporation*, 11 Bell J. Econ. 42 (1980). For the most recent round compare Alan Schwartz, *The Fairness of Tender Offer Prices in Utilitarian Theory*, 17 J. Legal Stud. 165 (1988), with Lucian Arye Bebchuk, *The Sole Owner Standard for Takeover Policy, id.* at 197, with Schwartz, *The Sole Owner Standard Reviewed, id.* at 231.

strategies. A law such as Wisconsin's does not add options to firms that would like to give more discretion to their managers; instead it destroys the possibility of divergent choices. Wisconsin's law applies even when the investors prefer to leave their managers under the gun, to allow the market full sway. Karpoff and Malatesta found that state anti-takeover laws have little or no effect on the price of shares if the firm already has poison pills (or related devices) in place, but strongly negative effects on price when firms have no such contractual devices. To put this differently, state laws have bite only when investors, given the choice, would deny managers the power to interfere with tender offers (maybe already *have* denied managers that power). See also Roberta Romano, *The Political Economy of Takeover Statutes*, 73 Va.L.Rev. 111, 128–31 (1987).

### B

Skepticism about the wisdom of a state's law does not lead to the conclusion that the law is beyond the state's power, however. We have not been elected custodians of investors' wealth. States need not treat investors' welfare as their summum bonum. Perhaps they choose to protect managers' welfare instead, or believe that the current economic literature reaches an incorrect conclusion and that despite appearances takeovers injure investors in the long run. Unless a federal statute or the Constitution bars the way, Wisconsin's choice must be respected.

■ Amanda relies on the Williams Act of 1968, incorporated into §§ 13(d), (e) and 14(d)–(f) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f). The Williams Act regulates the conduct of tender offers. Amanda believes that Congress created an entitlement for investors to receive the benefit of tender offers, and that because Wisconsin's law makes tender offers unattractive to many potential bidders, it is preempted. See *MITE*, 633 F.2d at 490–99, and Justice White's views, 457 U.S. at 630–40, 102 S.Ct. at 2634–40.

Preemption has not won easy acceptance among the Justices for several reasons.

First there is § 28(a) of the '34 Act, 15 U.S.C. § 78bb(a), which provides that "[n]othing in this chapter shall affect the jurisdiction of the securities commission ... of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." Although some of the SEC's regulations (particularly the one defining the commencement of an offer) conflict with some state takeover laws, the SEC has not drafted regulations concerning mergers with controlling shareholders, and the Act itself does not address the subject. States have used the leeway afforded by § 28(a) to carry out "merit regulation" of securities—"blue sky" laws that allow securities commissioners to forbid sales altogether, in contrast with the federal regimen emphasizing disclosure. So § 28(a) allows states to stop some transactions federal law would permit, in pursuit of an approach at odds with a system emphasizing disclosure and investors' choice. Then there is the traditional reluctance of federal courts to infer preemption of "state law in areas traditionally regulated by the States", *California v. ARC America Corp.*, —— U.S. ——, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989); see also, e.g., *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 716, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985); *Air Line Pilots Ass'n v. UAL Corp.*, 874 F.2d 439, 447–48 (7th Cir.1989). States have regulated corporate affairs, including mergers and sales of assets, since before the beginning of the nation.

Because Justice White's views of the Williams Act did not garner the support of a majority of the Court in *MITE*, we reexamined that subject in *CTS* and observed that the best argument for preemption is the Williams Act's "neutrality" between bidder and management, a balance designed to leave investors free to choose. This is not a confident jumping-off point, though: "Of course it is a big leap from saying that the Williams Act does not itself exhibit much hostility to tender offers to saying that it implicitly forbids states to adopt more hostile regulations, but this

leap was taken by the Supreme Court plurality and us in *MITE* and by every court to consider the question since.... [W]hatever doubts of the Williams' Act preemptive intent we might entertain as an original matter are stifled by the weight of precedent." 794 F.2d at 262. The rough treatment our views received from the Court—only Justice White supported the holding on preemption—lifts the "weight of precedent".

There is a big difference between what Congress *enacts* and what it *supposes* will ensue. Expectations about the consequences of a law are not themselves law. To say that Congress wanted to be neutral between bidder and target—a conclusion reached in many of the Court's opinions, e.g., *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977)—is not to say that it also forbade the states to favor one of these sides. Every law has a stopping point, likely one selected because of a belief that it would be unwise (for now, maybe forever) to do more. *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393–94, 94 L.Ed.2d 533 (1987); *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1439 (7th Cir. 1988). Nothing in the Williams Act says that the federal compromise among bidders, targets' managers, and investors is the only permissible one. See Daniel R. Fischel, *From MITE to CTS: State Anti–Takeover Statutes, the Williams Act, the Commerce Clause, and Insider Trading*, 1987 Sup.Ct.Rev. 47, 71–74. Like the majority of the Court in *CTS*, however, we stop short of the precipice. 481 U.S. at 78–87, 107 S.Ct. at 1643–49.

The Williams Act regulates the *process* of tender offers: timing, disclosure, proration if tenders exceed what the bidder is willing to buy, best-price rules. It slows things down, allowing investors to evaluate the offer and management's response. Best-price, proration, and short-tender rules ensure that investors who decide at the end of the offer get the same treatment as those who decide immediately, reducing

pressure to leap before looking.[7] After complying with the disclosure and delay requirements, the bidder is free to take the shares. *MITE* held invalid a state law that increased the delay and, by authorizing a regulator to nix the offer, created a distinct possibility that the bidder would be unable to buy the stock (and the holders to sell it) despite compliance with federal law. Illinois tried to regulate the process of tender offers, contradicting in some respects the federal rules. Indiana, by contrast, allowed the tender offer to take its course as the Williams Act specified but "sterilized" the acquired shares until the remaining investors restored their voting rights. Congress said nothing about the voting power of shares acquired in tender offers. Indiana's law reduced the benefits the bidder anticipated from the acquisition but left the process alone. So the Court, although accepting Justice White's views for the purpose of argument, held that Indiana's rules do not conflict with the federal norms.

*CTS* observed that laws affecting the voting power of acquired shares do not differ in principle from many other rules governing the internal affairs of corporations. Laws requiring staggered or classified boards of directors delay the transfer of control to the bidder; laws requiring supermajority vote for a merger may make a transaction less attractive or impossible. 481 U.S. at 85–86, 107 S.Ct. at 1647–48. Yet these are not preempted by the Williams Act, any more than state laws concerning the *effect* of investors' votes are preempted by the portions of the Exchange Act, 15 U.S.C. § 78n(a)–(c), regulating the process of soliciting proxies. Federal securities laws frequently regulate process while state corporate law regulates substance. Federal proxy rules demand that firms disclose many things, in order to promote informed voting. Yet states may permit or compel a supermajority rule (even a unanimity rule) rendering it all but

---

7. To reduce is not to eliminate. Investors' options include selling to arbitrageurs in the market. This price fluctuates daily and may drop suddenly if the prospects of the bid's success dim.

impossible for a particular side to prevail in the voting. See Robert Charles Clark, *Corporate Law* § 9.1.3 (1986). Are the state laws therefore preempted? How about state laws that allow many firms to organize without traded shares? Universities, hospitals, and other charities have self-perpetuating boards and cannot be acquired by tender offer. Insurance companies may be organized as mutuals, without traded shares; retailers often organize as co-operatives, without traded stock; some decently large companies (large enough to be "reporting companies" under the '34 Act) issue stock subject to buy-sell agreements under which the investors cannot sell to strangers without offering stock to the firm at a formula price; Ford Motor Co. issued non-voting stock to outside investors while reserving voting stock for the family, thus preventing outsiders from gaining control (dual-class stock is becoming more common); firms issue and state law enforces poison pills. All of these devices make tender offers unattractive (even impossible) and greatly diminish the power of proxy fights, success in which often depends on buying votes by acquiring the equity to which the vote is attached. See Douglas H. Blair, Devra L. Golbe & James M. Gerard, *Unbundling the Voting Rights and Profit Claims of Common Shares*, 97 J.Pol.Econ. 420 (1989). None of these devices could be thought preempted by the Williams Act or the proxy rules. If they are not preempted, neither is Wis.Stat. § 180.726.

Any bidder complying with federal law is free to acquire shares of Wisconsin firms on schedule. Delay in completing a second-stage merger may make the target less attractive, and thus depress the price offered or even lead to an absence of bids; it does not, however, alter any of the procedures governed by federal regulation. Indeed Wisconsin's law does not depend in any way on how the acquiring firm came by its stock: open-market purchases, private acquisitions of blocs, and acquisitions

via tender offers are treated identically. Wisconsin's law is no different in effect from one saying that for the three years after a person acquires 10% of a firm's stock, a unanimous vote is required to merge. Corporate law once had a generally-applicable unanimity rule in major transactions,[8] a rule discarded because giving every investor the power to block every reorganization stopped many desirable changes. (Many investors could use their "hold-up" power to try to engross a larger portion of the gains, creating a complex bargaining problem that often could not be solved.) Wisconsin's more restrained version of unanimity also may block beneficial transactions, but not by tinkering with any of the procedures established in federal law.

Only if the Williams Act gives investors a right to be the beneficiary of offers could Wisconsin's law run afoul of the federal rule. No such entitlement can be mined out of the Williams Act, however. *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), holds that the cancellation of a pending offer because of machinations between bidder and target does not deprive investors of their due under the Williams Act. The Court treated § 14(e) as a disclosure law, so that investors could make informed decisions; it follows that events leading bidders to cease their quest do not conflict with the Williams Act any more than a state law leading a firm not to issue new securities could conflict with the Securities Act of 1933. See also *Panter v. Marshall Field & Co.*, 646 F.2d 271, 283–85 (7th Cir.1981); *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.1980), both holding that the evaporation of an opportunity to tender one's shares when a defensive tactic leads the bidder to withdraw the invitation does not violate the Williams Act. Investors have no right to receive tender offers. More to the point—since Amanda sues as bidder rather than as investor seeking to sell—the Williams Act does not create a right to

---

**8.** See William J. Carney, *Fundamental Corporate Changes, Minority Shareholders, and Business Purposes*, 1980 Am.Bar Found.Res.J. 69, 77–97; Bayless Manning, *The Shareholder's Appraisal* *Remedy: An Essay for Frank Coker*, 72 Yale L.J. 223, 226–30 (1962), for two descriptions of the rule, both at common law and in the early state corporate codes.

profit from the business of making tender offers. It is not attractive to put bids on the table for Wisconsin corporations, but because Wisconsin leaves the process alone once a bidder appears, its law may co-exist with the Williams Act.

### C

The Commerce Clause, Art. I, § 8 cl. 3 of the Constitution, grants Congress the power "[t]o regulate Commerce ... among the several States". For many decades the Court took this to be what it says: a grant to Congress with no implications for the states' authority to act when Congress is silent. See David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years* 171–83, 222–36 (1985) (discussing cases); Martin H. Redish & Shane V. Nugent, *The Dormant Commerce Clause and the Constitutional Balance of Federalism*, 1987 Duke L.J. 569. Limitations came from provisions, such as the Contract Clause, Art. I, § 10, cl. 1 ("No State shall ... pass any ... Law impairing the Obligation of Contracts"), expressly denying the states certain powers. The Contract Clause has been held to curtail states' authority over corporations, see *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), and it may have something to say about states' ability to limit the transferability of shares after they have been issued. See Henry N. Butler & Larry E. Ribstein, *State Anti–Takeover Statutes and the Contract Clause*, 57 U.Cin.L.Rev. 611 (1988). Broad dicta in *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852), eventually led to holdings denying states the power to regulate interstate commerce directly or discriminatorily, or to take steps that had unjustified consequences in other states. Meanwhile the Court began to treat the Contract Clause as if it said that "No State shall pass any *unwise* Law impairing the Obligation of Contracts", so that divergent clauses have become homogenized. *Chicago Board of Realtors, Inc. v. Chicago*, 819 F.2d 732, 742–45 (7th Cir. 1987).

■ When state law discriminates against interstate commerce expressly—for example, when Wisconsin closes its border to butter from Minnesota—the negative Commerce Clause steps in. The law before us is not of this type: it is neutral between inter-state and intra-state commerce. Amanda therefore presses on us the broader, all-weather, be-reasonable vision of the Constitution. Wisconsin has passed a law that unreasonably injures investors, most of whom live outside of Wisconsin, and therefore it *has* to be unconstitutional, as Amanda sees things. Although *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), sometimes is understood to authorize such general-purpose balancing, a closer examination of the cases may support the conclusion that the Court has looked for discrimination rather than for baleful effects. See Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich.L.Rev. 1091 (1986); Julian N. Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale L.J. 425 (1982). At all events, although *MITE* employed the balancing process described in *Pike* to deal with a statute that regulated all firms having "contacts" with the state, *CTS* did not even cite that case when dealing with a statute regulating only the affairs of a firm incorporated in the state, and Justice Scalia's concurring opinion questioned its application. 481 U.S. at 95–96, 107 S.Ct. at 1652–53. The Court took a decidedly confined view of the judicial role: "We are not inclined 'to second-guess the empirical judgments of lawmakers concerning the utility of legislation,' *Kassel v. Consolidated Freightways Corp.*, 450 U.S. [662] at 679 [101 S.Ct. 1309, 1320, 67 L.Ed.2d 580 (1981) ] (BRENNAN, J., concurring in judgment)." 481 U.S. at 92, 107 S.Ct. at 1651. Although the scholars whose writings we cited in Part II.A conclude that laws such as Wisconsin's injure investors, Wisconsin is entitled to give a different answer to this empirical question —or to decide that investors' interests should be sacrificed to protect managers' interests or promote the stability of corporate arrangements.

Illinois's law, held invalid in *MITE*, regulated sales of stock elsewhere. Illinois tried to tell a Texas owner of stock in a Delaware corporation that he could not sell to a buyer in California. By contrast, Wisconsin's law, like the Indiana statute sustained by *CTS*, regulates the internal affairs of firms incorporated there. Investors may buy or sell stock as they please. Wisconsin's law differs in this respect not only from that of Illinois but also from that of Massachusetts, which forbade any transfer of shares for one year after the failure to disclose any material fact, a flaw that led the First Circuit to condemn it. *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 847–48 (1st Cir.1988).[9]

Buyers of stock in Wisconsin firms may exercise full rights as investors, taking immediate control. No interstate transaction is regulated or forbidden. True, Wisconsin's law makes a potential buyer less willing to buy (or depresses the bid), but this is equally true of Indiana's rule. Many other rules of corporate law—supermajority voting requirements, staggered and classified boards, and so on—have similar or greater effects on some persons' willingness to purchase stock. *CTS*, 481 U.S. at 89–90, 107 S.Ct. at 1649–50. States could ban mergers outright, with even more powerful consequences. *Louisville & Nashville R.R. v. Kentucky*, 161 U.S. 677, 701–04, 16 S.Ct. 714, 723–25, 40 L.Ed. 849 (1896); see also *Kansas City, Memphis & Birmingham R.R. v. Stiles*, 242 U.S. 111, 117, 37 S.Ct. 58, 60, 61 L.Ed. 176 (1916); *Ashley v. Ryan*, 153 U.S. 436, 443, 14 S.Ct. 865, 867, 38 L.Ed. 773 (1894). Wisconsin did not allow mergers among firms chartered there until 1947. We doubt that it was violating the Commerce Clause all those years. Cf. Edmund W. Kitch, *Regulation and the American Common Market, in Regulation, Federalism, and Interstate Commerce* 7 (A. Dan Tarlock ed. 1981). Every rule of corporate law affects investors who live outside the state of incorporation, yet this has never been thought

sufficient to authorize a form of cost-benefit inquiry through the medium of the Commerce Clause.

Wisconsin, like Indiana, is indifferent to the domicile of the bidder. A putative bidder located in Wisconsin enjoys no privilege over a firm located in New York. So too with investors: all are treated identically, regardless of residence. Doubtless most bidders (and investors) are located outside Wisconsin, but unless the law discriminates according to residence this alone does not matter. *CTS*, 481 U.S. at 87–88, 107 S.Ct. at 1648–49; *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015–16, 64 L.Ed.2d 702 (1980); *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed. 2d 91 (1978). Every state's regulation of domestic trade (potentially) affects those who live elsewhere but wish to sell their wares within the state. A law making suppliers of drugs absolutely liable for defects will affect the conduct (and wealth) of Eli Lilly & Co., an Indiana firm, and the many other pharmaceutical houses, all located in other states, yet Wisconsin has no less power to set and change tort law than do states with domestic drug manufacturers. "Because nothing in the [Wisconsin] Act imposes a greater burden on out-of-state offerors than it does on similarly situated [Wisconsin] offerors, we reject the contention that the Act discriminates against interstate commerce." *CTS*, 481 U.S. at 88, 107 S.Ct. at 1649. For the same reason, the Court long ago held that state blue sky laws comport with the Commerce Clause. *Hall v. Geiger–Jones Co.*, 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); *Caldwell v. Sioux Falls Stock Yards Co.*, 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493 (1917); *Merrick v. N.W. Halsey & Co.*, 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498 (1917). Blue sky laws may bar Texans from selling stock in Wisconsin, but they apply equally to local residents' attempts to sell. That their application blocks a form of com-

---

**9.** The name should ring a bell. Hyde Park Partners was trying to acquire High Voltage Engineering! As a result of the First Circuit's decision, it did. Now High Voltage as parent of Amanda is trying to do to Universal what Hyde Park did to it. Ironies do not always come full circle, however.

merce altogether does not strip the states of power.

Wisconsin could exceed its powers by subjecting firms to inconsistent regulation. Because § 180.726 applies only to a subset of firms incorporated in Wisconsin, however, there is no possibility of inconsistent regulation. Here, too, the Wisconsin law is materially identical to Indiana's. *CTS*, 481 U.S. at 88–89, 107 S.Ct. at 1649–50. This leaves only the argument that Wisconsin's law hinders the flow of interstate trade "too much". *CTS* dispatched this concern by declaring it inapplicable to laws that apply only to the internal affairs of firms incorporated in the regulating state. 481 U.S. at 89–94, 107 S.Ct. at 1649–52. States may regulate corporate transactions as they choose without having to demonstrate under an unfocused balancing test that the benefits are "enough" to justify the consequences.[10]

To say that states have the power to enact laws whose costs exceed their benefits is not to say that investors should kiss their wallets goodbye. States compete to offer corporate codes attractive to firms. Managers who want to raise money incorporate their firms in the states that offer the combination of rules investors prefer. Ralph K. Winter, Jr., *State Law, Shareholder Protection, and the Theory of the Corporation*, 6 J. Legal Studies 251 (1977); Fischel, *supra*, 1987 Sup.Ct.Rev. at 74–84. Laws that in the short run injure investors and protect managers will in the longer run make the state less attractive to firms that need to raise new capital. If the law is "protectionist", the protected class is the existing body of managers (and other workers), suppliers, and so on, which bears no necessary relation to state boundaries. States regulating the affairs of domestic corporations cannot in the long run injure anyone but themselves. Professor Fischel makes the point, 1987 Sup.Ct.Rev. at 84:

In the short run, states can enact welfare-decreasing legislation that imposes costs on residents of other states. State anti-takeover statutes … may be paradigm examples of cost-exporting legislation that is enacted in response to lobbying pressure by in-state constituents. [The managers who gain from the law live in-state; the investors who lose may live elsewhere.] In the long run, however, states have no ability to export costs to non-resident investors. When entrepreneurs want to raise capital for a corporate venture, they must decide where to incorporate. The choice of where to incorporate in turn affects the price investors are willing to pay for shares. And because shares of stock have many perfect substitutes which offer the same risk-return combinations, it is impossible for the entrepreneur to pass on the effects of the law to investors…. Nor can a state export costs to the founding entrepreneur since corporations can be incorporated anywhere, regardless of the firm's physical location. States that enact laws that are harmful to investors will cause entrepreneurs to incorporate elsewhere.

The long run takes time to arrive, and it is tempting to suppose that courts could contribute to investors' welfare by eliminating laws that impose costs in the short run. See Gregg A. Jarrell, *State Anti–Takeover Laws and the Efficient Allocation of Corporate Control: An Economic Analysis of Edgar v. MITE Corp.*, 2 Sup.Ct.Econ. Rev. 111 (1983). The price of such warfare, however, is a reduction in the power of competition among states. Courts seeking to impose "good" rules on the states diminish the differences among corporate codes and dampen competitive forces. Too, courts may fail in their quest. How do judges know which rules are best? Often only the slow forces of competition reveal that information. Early economic studies may mislead, or judges (not trained as so-

**10.** The First Circuit considered in *Hyde Park Partners* the possibility that *CTS* had declared balancing of inter- and intra-state effects under *Pike* unnecessary when the state regulates a firm's internal affairs. 839 F.2d at 844–47. To be on the safe side, that court weighed effects of the Massachusetts law and found that most of its provisions were too inconsequential to be unconstitutional. Wisconsin's law is made of sterner stuff, and we can't avoid the issue so easily.

cial scientists) may misinterpret the available data or act precipitously. Our Constitution allows the states to act as laboratories; slow migration (or national law on the authority of the Commerce Clause) grinds the failures under. No such process weeds out judicial errors, or decisions that, although astute when rendered, have become anachronistic in light of changes in the economy. Judges must hesitate for these practical reasons—and not only because of limits on their constitutional competence—before trying to "perfect" corporate codes.

The three district judges who have considered and sustained Delaware's law delaying mergers did so in large measure because they believed that the law left hostile offers "a meaningful opportunity for success". *BNS, Inc. v. Koppers Co.*, 683 F.Supp. at 469. See also *RP Acquisition Corp.*, 686 F.Supp. at 482–84, 488; *City Capital Associates*, 696 F.Supp. at 1555. Delaware allows a merger to occur forthwith if the bidder obtains 85% of the shares other than those held by management and employee stock plans. If the bid is attractive to the bulk of the unaffiliated investors, it succeeds. Wisconsin offers no such opportunity, which Amanda believes is fatal.

Even in Wisconsin, though, options remain. Defenses impenetrable to the naked eye may have cracks. Poison pills are less fatal in practice than in name (some have been swallowed willingly), and corporate law contains self-defense mechanisms. Investors concerned about stock-watering often arranged for firms to issue pre-emptive rights, entitlements for existing investors to buy stock at the same price offered to newcomers (often before the newcomers had a chance to buy in). Poison pills are dilution devices, and so pre-emptive rights ought to be handy countermeasures.[11] So too there are countermeasures to statutes deferring mergers. The cheapest is to low-er the bid to reflect the costs of delay. Because every potential bidder labors under the same drawback, the firm placing the highest value on the target still should win. Or a bidder might take down the stock and pledge it (or its dividends) as security for any loans. That is, the bidder could operate the target as a subsidiary for three years. The corporate world is full of partially owned subsidiaries. If there is gain to be had from changing the debt-equity ratio of the target, that can be done consistent with Wisconsin law. The prospect of being locked into place as holders of illiquid minority positions would cause many persons to sell out, and the threat of being locked in would cause many managers to give assent in advance, as Wisconsin allows. (Or bidders might demand that directors waive the protections of state law, just as Amanda believes that the directors' fiduciary duties compel them to redeem the poison pill rights.) Many bidders would find lock-in unattractive because of the potential for litigation by minority investors, and the need to operate the firm as a subsidiary might foreclose savings or synergies from merger. So none of these options is a perfect substitute for immediate merger, but each is a crack in the defensive wall allowing some value-increasing bids to proceed.

At the end of the day, however, it does not matter whether these countermeasures are "enough". The Commerce Clause does not demand that states leave bidders a "meaningful opportunity for success". Maryland enacted a law that absolutely banned vertical integration in the oil business. No opportunities, "meaningful" or otherwise, remained to firms wanting to own retail outlets. *Exxon Corp. v. Governor of Maryland* held that the law is consistent with the Commerce Clause, even on the assumption that it injures consumers and investors alike. A state with the power to forbid mergers has the power to defer

---

11. Imagine a series of Antidote rights, issued by would-be bidding firms, that detach if anyone exercises flip-over rights to purchase the bidder's stock at a discount. Antidote rights would entitle the bidder's investors, *other than those who exercise flip-over rights*, to purchase the bidder's stock at the same discount available to investors exercising flip-over rights. Antidotes for flip-in rights also could be issued. In general, whenever one firm can issue rights allowing the purchase of cheap stock, another firm can issue the equivalent series of contingent pre-emptive rights that offsets the dilution.

them for three years. Investors can turn to firms incorporated in states committed to the dominance of market forces, or they can turn on legislators who enact unwise laws. The Constitution has room for many economic policies. "[A] law can be both economic folly and constitutional." *CTS*, 481 U.S. at 96–97, 107 S.Ct. at 1653–54 (Scalia, J., concurring). Wisconsin's law may well be folly; we are confident that it is constitutional.

AFFIRMED.