WLR FOODS, INC., Plaintiff,

v.

TYSON FOODS, INC., Defendant,

and

TYSON FOODS, INC. and WLR Acquisition Corp., Counterclaimants,

v.

WLR FOODS, INC., et als., Counterclaim-defendants.

Civ. A. No. 94–012–H.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Aug. 9, 1994.

Douglas Leigh Guynn, Wharton, Aldhizer & Weaver, Harrisonburg, VA, William R. Norfolk, Sullivan & Cromwell, New York City, for WLR Foods, Inc.

Leslie Allan Grandis, Thomas Francis Farrell, II, James Vernon Lane, Litten & Sipe, Harrisonburg, VA, James Linwood Sanderlin, James Rothgeb Sipe, Litten & Sipe, Harrisonburg, VA, Thomas Edward Spahn, McGuire, Woods, Battle & Boothe, Richmond, VA, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, Tyson Foods, Inc.

John Walter Zunka, Richard H. Milnor, Taylor & Zunka, Ltd., Charlottesville, VA, for William H. Groseclose, Herman D. Mason, George E. Bryan, Calvin G. Germroth, Charles W. Wampler, Jr., James L. Keeler, William D. Wampler, Charles L. Campbell, Stephen W. Custer and J. Craig Hott.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Tyson Foods, Inc. (Tyson) has commenced a hostile attempt to take over WLR Foods, Inc. (WLR). In doing so, it has made a tender offer to WLR shareholders of $30 per share. WLR has filed suit seeking a declaratory judgment affirming various measures undertaken by WLR to defend against Tyson's takeover attempt. Tyson has counterclaimed, asserting that such measures are illegal, that WLR's Board of Directors has breached its fiduciary duty, and that Virginia's statutory scheme affecting hostile takeover attempts is unconstitutional.

Presently before the court is Tyson's motion for a preliminary injunction challenging the constitutionality of four Virginia statutes that affect its attempt to take over WLR. The issues before the court are (1) whether the Virginia statutes are preempted by the Williams Act, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f); and (2) whether the Virginia statutes violate the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. Tyson's motion for a preliminary injunction is denied.

### I.

Tyson's constitutional challenge implicates four separate Virginia statutes ("the Virginia statutes"). The first is the Control Share Acquisitions Act ("Control Share Act"), Va. Code Ann. §§ 13.1-728.1 to -728.9 (Michie 1993). Generally, the Control Share Act denies voting rights to any shares held by an acquiror not approved by a Virginia corporation's Board of Directors, unless a majority of disinterested shares votes to grant such rights in a shareholder referendum. *Id.* § 13.1-728.3. "Interested" shares may not vote, and they are defined to include shares held by (1) the acquiror; (2) any officer of the target corporation; and (3) any employee of the target corporation who is also a director. *Id.* § 13.1-728.1. The Control Share Act's provisions apply upon a person's acquisition of at least one-fifth of the total votes

entitled to be cast in an election of directors. *Id.* This court previously has refused to preliminarily enjoin from voting in the control share referendum four WLR director/employees who continued as directors but resigned as employees for the purpose of voting their shares in the control share referendum. *See WLR Foods, Inc. v. Tyson Foods, Inc.,* 857 F.Supp. 496 (W.D.Va.1994).

The second statute at issue is the Affiliated Transactions Act, Va.Code Ann. §§ 13.1–725 to –727.1 (Michie 1993). As applied to this case, this statute makes it very difficult to merge with or otherwise absorb a Virginia corporation acquired in a tender offer for three years after the acquisition. Pursuant to this statute, Tyson would not be permitted to engage in an "affiliated transaction" [1] with WLR for three years unless the transaction was approved by (1) a majority, but not less than two, of WLR's "disinterested directors"; [2] *and* (2) two-thirds of voting shares in WLR, other than shares beneficially held by Tyson. *Id.* § 13.1–725.1. After three years, WLR may engage in an affiliated transaction with Tyson if (1) approved by two-thirds of voting shares in WLR, other than shares beneficially held by Tyson; *or* (2) approved by a majority of disinterested directors; *or* (3) Tyson pays a statutorily defined value to each class of WLR's voting securities. *Id.* §§ 13.1–726, –727.

The third statute affecting Tyson's tender takeover attempt is Va.Code Ann. § 13.1–646 (Michie 1993) ("Poison Pill Statute"). This statute authorizes a corporation's directors to issue discriminatory rights in favor of specific persons or classes, limited only by Va.Code § 13.1–690, governing directors' business judgment. *Id.* § 13.1–646(B). WLR has used this statute to enact a "flip-in" poison pill, which triggers upon the accumulation of fifteen percent or more of WLR stock by any shareholder. When triggered, WLR's poison pill allows all shareholders, except the shareholder who has accumulated at least fifteen percent of the shares, to purchase $136 worth of WLR stock for only $68. When exercised, this will substantially reduce the percentage of total shares held by Tyson, while simultaneously diminishing the value of each share. As an example, if Tyson accumulated sixty percent of 10,000,000 WLR shares outstanding through its $30 per share tender offer, the poison pill would trigger and could reduce Tyson's stake to only 21.3 percent, and the value of each share could drop from $30 to $20.33.

The final statute at issue is Va.Code Ann. § 13.1–690 (Michie 1993) ("Business Judgment Statute"). This court previously has ruled that § 690 focuses on the procedural indicia of good faith business judgment as measured by resort to an informed decision-making process, thus making irrelevant the substantive advice received by directors. *WLR Foods, Inc. v. Tyson Foods, Inc.,* 857 F.Supp. 492 (W.D.Va.1994). In short, the statute focuses on whether directors relied upon information and advice which they believed in good faith to be competent and reliable. *See id.* at 497. Tyson alleges that this prevents it from discovering whether WLR's directors acted in the best interests of the corporation in utilizing the other three statutes to defend against Tyson's takeover attempt.

## II.

In deciding whether to issue a preliminary injunction, the court must consider four factors: (1) the likelihood of irreparable harm to Tyson without the injunction; (2) the likelihood of harm to WLR with the injunction; (3) Tyson's likelihood of success on the merits; and (4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550

---

**1.** An affiliated transaction includes (1) a merger involving WLR and Tyson; (2) a share exchange in which Tyson acquires a class or series of voting shares of WLR; (3) disposition to Tyson of WLR's assets in excess of five percent of WLR's net worth, or any guaranty by WLR of Tyson's indebtedness in excess of five percent of WLR's net worth; (4) disposition to Tyson of more than five percent of the fair market value of voting shares in WLR; (5) dissolution of WLR if proposed by Tyson; and (6) any transaction which has the effect of increasing by more than five percent the percentage of voting shares in WLR owned by Tyson. Va.Code Ann. § 13.1–725 (Michie 1993).

**2.** "Disinterested directors" essentially is defined to consist of WLR directors who were directors before Tyson acquired WLR. *Id.*

F.2d 189, 193–96 (4th Cir.1977). These four factors are to be weighed flexibly based on a sliding-scale approach; a strong showing by a party with regard to one factor reduces the need for that party to make a strong showing concerning other factors. *Dan River, Inc. v. Icahn,* 701 F.2d 278, 283 (4th Cir.1983) (citing *North Carolina State Ports v. Dart Containerline Co.,* 592 F.2d 749, 750 (4th Cir. 1979)). The balance of hardships created by the likelihood of irreparable harm to each side is the most important consideration, and because of the extraordinary nature of a preliminary injunction the harm to the movant truly must be irreparable, rather than merely substantial, for a preliminary injunction to be granted. *See Hughes Network Sys., Inc. v. Interdigital Communications Corp.,* 17 F.3d 691, 693–94 (4th Cir.1994).

In this case, the balance of hardships and the public interest are tied to the likelihood of success on the merits. Several cases recognize the harm caused to tender offerors by delay or defeat of its offer caused by improper or illegal tactics undertaken by management. *See, e.g., Dan River,* 701 F.2d at 283–84; *Kennecott Corp. v. Smith,* 637 F.2d 181, 190 (3d Cir.1980); *Bendix Corp. v. Martin Marietta Corp.,* 547 F.Supp. 522, 532 (D.Md. 1982). In this case, Tyson alleges that the acquisition of WLR presents a unique business opportunity and that allowing WLR's management to improperly block the takeover would cause irreparable harm. Any potential harm to Tyson, however, is predicated on the invalidity of the statutes. If the statutes are constitutional, then WLR's use of them is not improper. Likewise, if the statutes are unconstitutional, then the delay in Tyson's takeover caused by WLR's use of the statutes potentially could cause great harm to Tyson. The court notes, however, that Tyson has presented no evidence that WLR's directors are preventing dissemination of information to shareholders or that they have taken any actions to entrench themselves further subsequent to Tyson's filing of the preliminary injunction motion. The possibility exists, of course, that before final judgment is entered in this matter WLR's directors could take such action or that the poison pill could trigger, but the extent of harm caused to Tyson would depend upon the constitutionality of the statutes pursuant to which the directors acted.

Similarly, the extent of harm caused to WLR by a preliminary injunction would depend upon the likelihood of success on the merits. If the court eventually declares the Virginia statutes constitutional but grants the preliminary injunction, WLR is robbed of its opportunity to take legitimate defensive measures presumably designed to ensure the adequacy of Tyson's tender offer. Conversely, if the statutes are unconstitutional WLR would suffer no harm because its actions pursuant to the statutes would have been invalid.

Furthermore, the public interest is directly tied to the likelihood of success on the merits when the issue is the validity of statutes. If the statutes are valid, then the public interest is served by their enforcement. If they are unconstitutional, then the public interest is served by their invalidation. Because in this case the other three *Blackwelder* factors flow from it, the likelihood of success on the merits will determine whether the court will grant a preliminary injunction.

## III.

A preliminary matter will affect the merits of Tyson's constitutional challenges. Tyson asserts that the four Virginia statutes operate as a scheme in the area of hostile takeovers and tender offers. As a result, Tyson contends that even if each statute individually is constitutional, the scheme as a whole can be unconstitutional.

The Supreme Court recently addressed this issue in its June 17, 1994 decision in *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). In that case, the Court invalidated on Commerce Clause grounds a Massachusetts pricing order containing two components: (1) an assessment on all milk, whether produced in-state or out of state, sold to in-state retailers; and (2) a subsidy provided to in-state dairy farmers using the funds received from the assessment. *Id.* at ——, 114 S.Ct. at 2209–10. The Court rejected the proposition that the pricing order was valid merely because it was the combination of two

independently lawful regulations. *Id.* at ——–——, 114 S.Ct. at 2213–17. Tyson asserts that this case conclusively shows that statutes may be unconstitutional as a scheme, even if the scheme's components are all separately constitutional.

*West Lynn Creamery* is not directly on point, however. Unlike this case, it involved two statutes that the legislature intentionally joined together to create an integrated program—the subsidy flowed directly from the funds received from the assessment. The Court noted that "[b]y conjoining a tax and a subsidy, Massachusetts has created a program more dangerous to interstate commerce than either part alone." *Id.* at ——– ——, 114 S.Ct. at 2214–15. The Court refused to "analyze separately two parts of an integrated regulation, [because] we cannot divorce the premium payments from the use to which they are put." *Id.* at ——, 114 S.Ct. at 2215. In contrast, the statutes that Tyson challenges here are not parts of an integrated program. They were enacted separately at separate times for separate purposes and with separate applications. Their only apparent link is that they all affect Tyson's bid to take over WLR.

Notwithstanding this distinction, dicta in *West Lynn Creamery* could be read to support Tyson's assertion that a statutory scheme can be invalid even if all of its parts are constitutional. The Court later stated in *West Lynn Creamery*, "[o]ur Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce. Rather our cases have eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *Id.* Based on this statement, it could be argued that if several statutes actually affect an area of interstate commerce or actually stand as an obstacle to the purposes and objectives of federal law, then they should not be used together in a manner detrimental to interstate commerce or in contravention of federal law. The effect of the statutes, if burdensome enough, should be sufficient to preclude a particular unconstitutional application of the statutes used together. "[T]he critical consideration is the overall effect of the statute[s] on both local and interstate activity." *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). Courts must "determine whether the statute[s] under attack, whatever [their] name may be, will in [their] practical operation work discrimination against interstate commerce." *West Lynn Creamery,* —— U.S. at ——– ——, 114 S.Ct. at 2215–16 (citations omitted). This dicta suggests, therefore, that the practical operation of statutes is more important than their form.

Extending *West Lynn Creamery* to non-integrated statutes not intentionally joined together, however, would create enormous difficulties for district courts. In *West Lynn Creamery,* the Court was able to invalidate the two components of the milk pricing order because the legislature purposefully linked them together. *Id.* at ——, 114 S.Ct. at 2213–15. The Court was able to do so because the Massachusetts legislature never intended either statute to stand separately. With non-integrated statutes that are separately constitutional, however, what is a court to do if it determines that the overall "scheme" is unconstitutional? The statutes have separate applications that are constitutional, so none can be struck down as unconstitutional. Only when used together in a particular way would they be unconstitutional. Thus, a court only could enjoin that particular unconstitutional use.

But what is the particular unconstitutional way in which the Virginia statutes were used? At what point did WLR enter the realm of unconstitutionality? Was it when they approved the poison pill? Was it when they called for a control share referendum? Does it matter whether they understood the implications of the Affiliated Transactions Act when they took action? Could they approve a poison pill if they opt out of the Control Share Act? Could they utilize the Control Share Act if they do not adopt a poison pill? From these and many more questions that have no clear answers, it is apparent that a court would be faced with a dilemma when evaluating a non-integrated statutory "scheme". If the collective statutes were used unconstitutionally, what part

should be enjoined? Perhaps the management could be given a choice—either redeem the poison pill or opt out of the Control Share Act. Would that be sufficient to overcome the unconstitutional application of the statutes? Perhaps management could be precluded from utilizing the Control Share Act or adopting a poison pill anytime the Affiliated Transactions Act applies. The Affiliated Transactions Act applies, however, every time that the Control Share Act applies because of the ownership percentage requirements that trigger each statute. This would mean that management would always be precluded from using the Control Share Act, which as a practical matter is the same as declaring the Control Share Act unconstitutional.

The convoluted nature of the matter demonstrates the problems of extending *West Lynn Creamery* beyond an integrated statutory program. Despite such problems, however, the court will assume without deciding that non-integrated statutes can be unconstitutional as a scheme even if they are separately constitutional.

## IV.

The first question in this case is whether the Williams Act, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f), preempts the Virginia statutes. Pursuant to the Supremacy Clause of the United States Constitution, federal law is the "supreme law of the Land ..., any Thing in the Constitution or Laws of a State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. In addition to an explicit indication by Congress of its intent to preempt state law, state statutes are preempted when it is physically impossible to comply with both federal and state laws or when "the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 78–79, 107 S.Ct. 1637, 1644, 95 L.Ed.2d 67 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Tyson contends that federal law preempts the Virginia statutes because they stand as an obstacle to the purposes and objectives of the Williams Act.

The Williams Act regulates disclosure to shareholders and procedures required in tender offers. First, it requires a tender offeror to file a statement disclosing, *inter alia*, the offeror's identity and background, the funding source to be used, any anticipated changes in corporate structure, and the extent of the offeror's holdings in the target corporation. *See* 15 U.S.C. § 78n(d)(1) (incorporating § 78m(d)(1) by reference); 17 C.F.R. §§ 240.13d–1, 240.14d–3 (1986). Secondly, it establishes certain procedures that tender offerors must follow. Shareholders who have tendered their shares may withdraw them while the offer remains open if the shares have not been purchased within sixty days of the commencement of the offer. 15 U.S.C. § 78n(d)(5); 17 C.F.R. § 240.14d–7(a)(1), *as amended by* 51 Fed.Reg. 25873 (1986). Also, any offer must remain open for at least twenty business days. *Id.* § 240.-14e–1(a). If the offeror receives more shares than it seeks to purchase, then it must purchase on a pro rata basis from all tendering shareholders. 15 U.S.C. § 78n(d)(6); 17 C.F.R. § 240.14d–8. Lastly, the offeror must pay the same price for all shares purchased during the offer, including paying any increase to shareholders that already had tendered their shares before the increase. 15 U.S.C. § 78n(d)(7).

■ The primary purpose of the Williams Act is to protect shareholders from the coercive aspects of tender offers by "plac[ing] investors on an equal footing with the takeover bidder." *CTS*, 481 U.S. at 82, 107 S.Ct. at 1645–46 (quoting *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977)). The Williams Act protects investors in part by attempting to maintain a balance between management and the offeror to create a fairly level playing field in the contest for shares. *See Edgar v. MITE Corp.*, 457 U.S. 624, 633, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982) (plurality opinion) ("[I]t is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder."). This has led to the view endorsed by Tyson that balance between management and the offeror is an independent purpose of the Williams Act. As a

result, Tyson asserts that the Williams Act preempts the Virginia statutes if they deprive a tender offer of a "meaningful opportunity for success." [3]

■ This court rejects the meaningful opportunity for success test for determining whether the Williams Act preempts the Virginia statutes. Creating neutrality between management and the offeror simply is not an independent purpose of the Williams Act. "Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors." *Piper,* 430 U.S. at 29, 97 S.Ct. at 943.[4] Even the three justice plurality in *MITE,* which Tyson reads as supporting its view, makes that distinction. "Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage *that could frustrate the exercise of an informed choice." MITE,* 457 U.S. 624, 634, 102 S.Ct. 2629, 2636 (emphasis added). In *CTS,*[5] the Court clarified that "the overriding concern of the MITE plurality was that the ... statute considered in that case operated to favor management against offerors, *to the detriment of shareholders." CTS,* 481 U.S. at 81–82, 107 S.Ct. at 1645 (emphasis added). Management must not be permitted to gain an undue advantage *over the investors,* but the Williams Act simply does not mandate that management have no advantage over the offeror, as long as such advantage does not harm the investors. The crucial relationships are those between the investors and management and between the investors and the offeror, not the relationship between management and the offeror. The purpose of the Williams Act is to protect investors by ensuring an informed choice; therefore, the Virginia statutes are preempted if they favor either management or the tender offeror over the investors.

The Virginia statutes clearly give power to management and remove it from tender offerors, but they are preempted only if they do so to the detriment of shareholders. Viewing all of the statutes collectively, the statutory "scheme" puts several obstacles in the way of Tyson's tender offer. First, if Tyson acquires more than fifteen percent of WLR's shares a poison pill will trigger, substantially reducing Tyson's percentage of ownership and the value of each share.[6] Then, pursuant to the Control Share Act, unless the directors opt out of its provisions, disinterested shareholders could vote to take away voting rights from any shares that Tyson owns. If Tyson nonetheless managed to take over WLR, it effectively would be precluded from merging it into Tyson for at least three years pursuant to the Affiliated Transactions Act. Furthermore, pursuant to the Business Judgment Statute the decisions of WLR's directors in enacting defensive measures could be reviewed only for good faith business judgment, with no discovery of the substantive advice that the directors received in reaching their decisions.

■ The Virginia statutes do not stand as an obstacle to the purposes and objectives of the Williams Act. In *CTS,* the Supreme Court reviewed an Indiana statute virtually identical to the Control Share Act and held

---

3. The "meaningful opportunity for success" test also has been used by a few district courts in deciding whether the Williams Act preempts state statutes. *See, e.g., Topper Acquisition Corp. v. Emhart Corp.,* No. 89–00110–R, 1989 U.S.Dist. LEXIS 9910, at *12 (E.D.Va. Mar. 23, 1989) ("[T]he Williams Act preempts state anti-takeover statutes which deprive a hostile bidder of a 'meaningful opportunity for success.' "); *West Point–Pepperell, Inc. v. Farley, Inc.,* 711 F.Supp. 1096, 1103 (N.D.Ga.1989) (finding preemption if a statute leaves a hostile offeror with no meaningful opportunity for success absent approval from the board that it seeks to replace); *BNS, Inc. v. Koppers Co., Inc.,* 683 F.Supp. 458, 469 (D.Del.1988) (creating the meaningful opportunity for success test).

4. Neither the plurality in *MITE* nor the Court in *CTS* questioned any part of *Piper.*

5. The Court in *CTS* noted that it was not bound by the reasoning in *MITE* because it was not a majority opinion. It stated that "[w]e need not question that reasoning, however, because we believe the [statute] passes muster even under the broad interpretation of the Williams Act articulated by Justice White in *MITE." CTS,* 481 U.S. at 81, 107 S.Ct. at 1645.

6. Assuming 10,000,000 shares in WLR outstanding with a value of $30 per share, Tyson would need to hold approximately eighty-five percent of WLR shares after the tender offer in order to retain a majority after the poison pill triggered.

that it was not preempted by the Williams Act. *CTS*, 481 U.S. at 81–84, 107 S.Ct. at 1645–46. The Control Share Act furthers the policy of investor protection by allowing disinterested shareholders to vote as a group and avoid the coercive nature of two-tiered tender offers, in which shareholders are virtually forced to tender out of fear that a successful offeror will seize control and buy non-tendered shares at a depressed price. *Id.* at 83, 107 S.Ct. at 1646. The Control Share Act excludes management and the tender offeror and allows disinterested shareholders collectively to evaluate the fairness of the offer. *Id.* at 83–84, 107 S.Ct. at 1646. Furthermore, by requiring offerors to furnish target corporations with a control share acquisition statement,[7] which then must be mailed by the target corporation to shareholders, *see* Va.Code Ann. § 13.1–728.6(B)(1) (Michie 1993), the Control Share Act facilitates the free exercise of informed choices by independent investors.[8]

■ Likewise, the Affiliated Transactions Act does not stand as an obstacle to the purposes and objectives of the Williams Act. Although it makes tender offers less attractive by effectively delaying a merger for at least three years, it does not regulate the procedures or disclosures required in a tender offer. It applies whether an acquisition was made by tender offer or any other means of gaining control. As the Seventh Circuit recognized in *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496 (7th Cir.1989) where it held that the Williams Act does not preempt a statute very similar to the Affiliated Transactions Act, "[d]elay in completing a second-stage merger may make the target less attractive, and thus depress the price offered or even lead to an absence of bids; it does not, however, alter any of the

procedures governed by federal regulation." *Id.* at 504.

■ To the extent that it does affect Tyson's tender offer, however, the Virginia legislature apparently intended the Affiliated Transactions Act to protect minority shareholders from self-dealing by the majority and to discourage corporate raiders from using a target corporation's assets for the raider's own devices or from extracting greenmail from the target. Revised Joint Bar Comm. *Commentary to Section 13.1–725 of the Virginia Stock Corporation Act, Virginia Corporation Law* 239 (Michie 1992). Like the Control Share Act, the Affiliated Transactions Act gives independent shareholders a tool to prevent abuses by an acquiror. It interferes neither with the procedures set up by the Williams Act nor with the ability of shareholders to make an informed choice about a tender offer.

■ The Poison Pill Statute also does not stand as an obstacle to the purposes and objectives of the Williams Act. It gives management a very strong tool to use to block a tender offer, but directors may not do so to the detriment of the shareholders. Any action by directors regarding poison pills is explicitly subject to the provisions of the Business Judgment Statute. *See* Va.Code Ann. § 13.1–646(B) (Michie 1993). Directors are precluded from adopting or refusing to redeem a poison pill if to do so does not comport with the directors' "good faith business judgment of the best interests of the corporation." *Id.* § 13.1–690. The Poison Pill Statute creates the potential for management to entrench itself at the expense of the shareholders, but the possibility of incurring personal liability for breach of fiduciary duty provides a strong incentive for directors to

---

7. The control share acquisition statement provides shareholders with even more information than is required by the Williams Act. *Compare* Va.Code § 13.1–728.4 *with* 15 U.S.C. § 78n(d)(1) and 17 C.F.R. §§ 240.13d–1, 240.14d–3.

8. Tyson also asserts that the Control Share Act is preempted by Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, because § 14(a) occupies the field of the regulation of proxy solicitation. The court finds no evidence in § 14(a) that Congress intended to do so. Moreover, the Control Share Act does not seek to

regulate the process of proxy solicitation, which is the focus of § 14(a); rather, it merely affects the timing of when solicitation may begin. *See* Va.Code Ann. § 13.1–728.5(E) (Michie 1993). Tyson further contends that the Control Share Act is preempted because § 13.1–728.4(6) requires more information to be sent to shareholders than the SEC mandates. In light of the above discussion concerning the fundamental purpose of the Williams Act, such a contention is without support.

use poison pills only to defeat inadequate offers. In fact, a 1988 study conducted by Georgeson & Company, Inc., a leading proxy solicitation firm, found that target corporations with poison pills received an average final offer 78.5% greater than the price of its stock six months before the commencement of the tender offer, while corporations without poison pills gained only 57%. *See* Fogg & Sterling, *Poison Pill Update, in* M. Katz & R. Loeb, *Acquisitions and Mergers 1988* 817, 844 (1988). Furthermore, the study revealed that target corporations with poison pills outperformed the S & P 500 Index by 53%, while corporations with no poison pills performed only 31% better than the Index. *Id.* at 845. Provided that directors utilize poison pills in the best interests of the corporation, as Virginia's Poison Pill Statute requires, poison pills may be an effective method for increasing the bid in tender offers.

■ Reviewing director conduct pursuant to the above three statutes, using the Business Judgment Statute, also does not cause the Virginia statutory "scheme" to be preempted. Directors must act based on their good faith business judgment of the best interests of the corporation. *See* Va. Code § 13.1–690. Tyson asserts that directors wishing to defeat a hostile tender offer need only hear advice from competent sources and their decisions become insulated from judicial scrutiny. The court disagrees. Courts must look to procedural indicia of good faith business judgment; resort to an informed decisionmaking process must be undertaken in good faith. *WLR Foods, Inc. v. Tyson Foods, Inc.,* 857 F.Supp. 492, 497 (W.D.Va.1994). Directors are entitled to *rely* on competent advice, not to hear and disregard it just to go through the motions of satisfying § 690. This prevents directors from attempting to defeat a tender offer unless they rely in good faith on competent advice and information stating that the offer is not in the best interests of the corporation. Although the court expresses no opinion concerning whether WLR's directors complied with § 690 in attempting to defeat Tyson's tender offer, the statute itself does not stand as an obstacle to the purposes and objectives of the Williams Act, even when used in conjunction with the other three statutes at issue.[9] Management still is unable to interfere with investors' free exercise of an informed choice in responding to a tender offer.[10]

■ The Virginia statutory "scheme" makes tender offers for Virginia corporations more difficult than they would be absent the statutes. Although the statutes seem to give power to management with the same hand that takes it away from offerors, they do not do so to the detriment of investors. The Williams Act does not grant investors a right to tender their shares at a premium; it merely provides that certain information must be provided and certain procedures must be followed to ensure that investors are permitted to make an informed choice. The cumulative effect of the Virginia statutes does not interfere with those objectives in any way. As a result, the Williams Act does not preempt the Virginia statutes, either separately or together.

## V.

■ The court next must decide whether the Virginia statutes violate the Commerce Clause of the United States Constitution,

---

**9.** Management's compliance with its fiduciary duties does not affect the constitutional issues presented.

In the unlikely event that management were to take actions designed to diminish the value of the corporation's shares, it may incur liability under state law. But this problem does not control our pre-emption analysis. Neither the [Williams] Act nor any other federal statute can assure that shareholders do not suffer from the mismanagement of corporate officers and directors.

*CTS,* 481 U.S. at 85 n. 9, 107 S.Ct. at 1647 n. 9.

**10.** Because the Business Judgment Statute requires directors to act in the best interests of the corporation, it also ensures that Virginia's statutory "scheme" passes Tyson's broad "meaningful opportunity for success" test. All that an offeror must do in order to have a meaningful opportunity for success is present a high enough offer, acceptance of which is in the best interests of the corporation. Directors then could opt out of the Control Share Act and redeem the poison pill. Furthermore, if they believed that an immediate merger was in the best interests of the corporation, they could vote to override the restrictions of the Affiliated Transactions Act and encourage shareholders to do the same.

U.S. Const. art. 1, § 8, cl. 3. Although on its face the Commerce Clause merely gives Congress the power to regulate commerce among the states, "it has been settled for more than a century that the Clause prohibits States from taking certain actions respecting interstate commerce even absent congressional action." *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987). Tyson asserts that the Virginia statutes violate the dormant Commerce Clause in two ways. First, Tyson argues that the statutes clearly discriminate against interstate commerce and are not justified by a valid purpose unrelated to economic protectionism. *See C & A Carbone, Inc. v. Town of Clarkstown,* — U.S. —, —, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994). Secondly, Tyson contends that the statutes impose a burden on interstate commerce that exceeds the statutes' putative local benefits. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

 As an initial matter, there can be no doubt that the Virginia statutes affect interstate commerce. "It is well settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow." *Carbone,* — U.S. at —, 114 S.Ct. at 1682 (citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 31, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937)). The Virginia statutes clearly do so by affecting the interstate market for corporate control. In fact, this principle was so obvious to the Supreme Court in *CTS* that it did not bother to say so; it simply considered whether the statute at issue violated the Commerce Clause. *See CTS,* 481 U.S. at 87, 107 S.Ct. at 1648.

### A.

The first way in which Tyson contends that the Virginia statutes violate the Commerce Clause is by discriminating against interstate commerce. There is no dispute that the Virginia statutes treat in-state and out of state tender offerors the same way; the statutes apply regardless of who tries to take over a Virginia corporation. Statutes may discriminate, however, even if they treat in-state and out of state offerors equally. *See Carbone,* — U.S. at —, 114 S.Ct. at 1682. Tyson asserts that the statutes discriminate against interstate commerce because they impose an effective ban on interstate commerce in corporate control of Virginia corporations. To prevail on this issue, Tyson attempts to position this case within the line of cases culminating in *Carbone.*

In *Carbone,* the Supreme Court analyzed a local ordinance that required all nonhazardous solid waste in Clarkstown, New York to be taken to a transfer station for separation of recyclable from non-recyclable items. *Id.* at —, 114 S.Ct. at 1680. All waste processors, whether in-state or out of state, were prohibited from processing solid waste anywhere other than at the designated transfer station, where they were required to pay a tipping fee even if the waste had already been sorted before arriving at the station. *Id.* at —, 114 S.Ct. at 1681. The Court held that the ordinance violated the Commerce Clause because it hoarded a local resource and squelched all competition for separating recyclable from non-recyclable waste. *Id.* at —, 114 S.Ct. at 1683. *See also Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* — U.S. —, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992) (invalidating a statute prohibiting landfill operators from accepting solid waste generated outside of the county because of the statute's protectionist nature); *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951) (invalidating an ordinance that made it unlawful to sell milk as pasteurized unless it was processed within five miles of the city because the ordinance protected a local industry from any competition from out of state); *Brimmer v. Rebman,* 138 U.S. 78, 82–83, 11 S.Ct. 213, 214, 34 L.Ed. 862 (1891) (invalidating a Virginia statute imposing special inspection fees on meat from animals slaughtered more than 100 miles from the place of sale because the statute effectively prevented the sale of meat from animals slaughtered in distant states).

The Virginia statutes do not have the same effect as the statutes struck down in the *Carbone* line of cases. By Tyson's own admission, these case stand for the proposition

that a statute clearly discriminates against interstate commerce if it completely eliminates the flow of interstate commerce in an article of commerce. Tyson's Supp. Mem. on Constit. Issues at 30. The Virginia statutes do not completely eliminate the flow of interstate commerce in hostile takeover attempts of Virginia corporations. More to the point, they do not remove competition for corporate control or hoard a local resource. Any potential acquiror that makes an adequate offer may gain control of a Virginia corporation; the Virginia statutes make it more expensive to do so.

In the *Carbone* line of cases, similarly situated entities were treated differently. In *Carbone*, —— U.S. ——, 114 S.Ct. 1677, one transfer station could separate waste, but others could not do so. In *Fort Gratiot*, —— U.S. ——, 112 S.Ct. 2019, some solid waste producers could dump their waste, but others could not do so. In *Dean Milk*, 340 U.S. 349, 71 S.Ct. 295, some producers could sell their milk as pasteurized, but others could not do so. In *Brimmer*, 138 U.S. 78, 11 S.Ct. 213, some dealers could sell their meat without a special fee, but others could not do so. In this case, however, everyone stands on equal footing in making tender offers to shareholders of Virginia corporations. As the Supreme Court stated, "[b]ecause nothing in the [statutes] imposes a greater burden on out-of-state offerors than it does on similarly situated [in-state] offerors, we reject the contention that the [statutes] discriminate[ ] against interstate commerce." *CTS*, 481 U.S. at 88, 107 S.Ct. at 1649.[11]

### B.

The second way in which Tyson contends that the Virginia statutes violate the Commerce Clause is pursuant to the balancing test enunciated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Pursuant to the *Pike* test, the Virginia statutes violate the Commerce Clause if they impose a burden on interstate commerce that clearly exceeds their putative local benefits. *See id.* at 142, 90 S.Ct. at 847.

WLR asserts, however, that the *Pike* test no longer applies to Commerce Clause challenges to state laws regulating intrastate corporate governance, based on the Supreme Court's treatment of the issue in *CTS*. In that case, the Court rejected the argument that Indiana's Control Share Act violates the Commerce Clause because of its potential to hinder tender offers, but it did so without ever mentioning the *Pike* test. *See CTS*, 481 U.S. at 89–92, 107 S.Ct. at 1649–51. This has caused some courts to conclude that the *Pike* test no longer applies in this area. *See, e.g., Amanda Acquisition Corp. v. Universal Foods, Inc.*, 877 F.2d 496, 507 (7th Cir.1989); *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 844 (1st Cir.1988). Although the Court did not mention *Pike* by name, it examined tender offers' effect on interstate commerce and the local interests that Indiana sought to advance through the Control Share Act. *Id.* Without explicitly referring to *Pike*, the Court implicitly found that a state's interests in defining the attributes of corporations organized pursuant to its laws were sufficient to justify any burdens on interstate commerce associated with the Control Share Act. Although the *Pike* test may not have been used in name, its logic was used in principle.

In examining the Virginia statutes' effect on interstate commerce, Tyson asserts that they violate the Commerce Clause by effectively foreclosing the opportunity to gain control of a Virginia corporation absent consent of the management. In this area, however, "state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law." *CTS*, 481 U.S. at 89, 107 S.Ct. at 1649. By enacting these and other statutes, Virginia has defined the attributes of its corporations. Based upon the four Virginia statutes, a Virginia corporation is an entity (1) in which shareholders holding over one-fifth of the shares have no voting rights absent consent of the directors or the disinterested shareholders (Control Share Act); (2) that cannot be merged into another entity for three years

---

11. In *CTS*, the Court did not even address the *Carbone* line of cases, amplifying the distinction between the regulations struck down in those cases and statutes that evenhandedly regulate tender offers.

without consent of its directors (Affiliated Transactions Act); (3) that can issue discriminatory rights to the detriment of some of its shareholders, provided that such discrimination is in the best interests of the corporation (Poison Pill Statute); and (4) whose directors must conduct themselves based upon their good faith business judgment of the best interests of the corporation, and who may satisfy this standard by relying in good faith on competent advice received pursuant to an informational process undertaken in good faith (Business Judgment Statute).

"By prohibiting certain transactions, and regulating others, such laws necessarily affect certain aspects of interstate commerce." *Id.* at 90, 107 S.Ct. at 1650. The Virginia statutes make it more difficult and more expensive to gain control of a Virginia corporation, but so do supermajority voting requirements, dissenters' rights, and staggered directors' terms. *See id.* at 90 & n. 12, 107 S.Ct. at 1650 & n. 12. In fact, states could ban mergers completely without violating the Commerce Clause. *Louisville & Nashville R.R. v. Kentucky,* 161 U.S. 677, 701–04, 16 S.Ct. 714, 723–24, 40 L.Ed. 849 (1896); *Amanda,* 877 F.2d at 506.

In defining the attributes of its corporations, Virginia "has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs." *CTS,* 481 U.S. at 91, 107 S.Ct. at 165. Through the four statutes at issue, Virginia has given certain tools to shareholders and management, acting in the best interests of the corporation, to ensure that tender offers succeed only if they are consistent with the long-term interests of the corporation. Shareholders of Virginia corporations need not fear the coercive pressures of two-tiered tender offers or the prospect of corporate raiders seeking to extract greenmail by threatening to immediately dismantle and sell a corporation's assets.

Virginia need not define its corporations as other states do; it must only provide residents and nonresidents with equal access to them. *Id.* at 94, 107 S.Ct. at 1652. If Virginia believes that hostile tender offers have

the potential to be harmful to the corporations that it creates and whose attributes it defines, then it is permitted to enact regulations designed to neutralize that harm. Tyson's argument that such a policy can lead to inefficient management would be better addressed to the Virginia legislature rather than this court. Whether these statutes may limit the number of successful tender offers does not substantially affect the Commerce Clause analysis. *Id.* at 93–94, 107 S.Ct. at 1651–52.

The Commerce Clause does not give Tyson a right to purchase WLR for $30 per share. It merely ensures that Tyson have a chance to do so equal to that of a Virginia resident offering $30 per share. The Virginia statutes do nothing to upset that equality. They make it more difficult for tender offerors, resident and nonresident alike, to gain control of a Virginia corporation. As a result, Tyson is unlikely to succeed on the merits of its Commerce Clause challenge.

## VI.

The Virginia statutes, even when viewed as a scheme, are not preempted by the Williams Act and do not violate the Commerce Clause. Whatever the merits or demerits of discouraging tender offers, the Constitution is not concerned with the wisdom of economic policy. "The Constitution does not require the States to subscribe to any particular economic theory." *Id.* at 92, 107 S.Ct. at 1651. Based on analysis of the four *Blackwelder* factors, Tyson's motion for a preliminary injunction is denied.

An appropriate Order shall this day issue.