PANHANDLE EASTERN PIPE LINE
COMPANY, a Delaware corporation,
Plaintiff,

v.

MADISON COUNTY DRAINAGE
BOARD, Stephen E. Randolph, Gene
Best, Doug Drake, Jeff Purdue, Ted
Waymire, Emley J. Hallgrath, Patrick
Manship, Bradley A. Rayl Surveying and
Engineering, and Van Horn Excavating,
Inc., Defendants.

No. IP 95–0682–C H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 18, 1995.

Thomas A. Withrow, Henderson Daily Withrow & Devoe Indianapolis, Indiana, for plaintiff.

William J. Norton, Anderson, Indiana, for defendants.

Dennis F. McCrosson, Stilwell, McCrosson & Life, Indianapolis, Indiana for intervenor Jane Morehead.

Nancy L. Gettinger, Office of the Attorney General, Indianapolis, Indiana for amicus curiae State of Indiana.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

HAMILTON, District Judge.

This case concerns the ditches of Madison County, Indiana. It pits the interests of farmers who need to drain their land against the interests of a pipeline company whose underground pipelines run through the needed drainage ditch. Plaintiff Panhandle Eastern Pipe Line Company ("Panhandle") brought this action against the Madison County Drainage Board (the "Drainage Board"), its members, and an engineering firm and an excavation company hired to provide services to the Drainage Board. The defendants plan to deepen and widen the John Dugan Regulated Drain in order to improve drainage of nearby farmland. Panhandle seeks injunctive and declaratory relief to prevent the Drainage Board from widening and deepening the drain in ways that would either damage several Panhandle pipelines or force Panhandle to incur substantial expense in burying those pipelines deeper in the ground. Panhandle argues that Indiana law does not authorize, and that the federal Constitution forbids, the Drainage Board's attempt to require Panhandle to bear the cost of burying its pipelines deeper to accommodate the drainage project. Panhandle also argues that the Drainage Board has acted without giving Panhandle notice required by Indiana statute. This entry states the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). In summary, the court concludes that Ind.Code § 36-9-27-48 authorizes the Drainage Board to require Panhandle to pay the cost of reburying its pipelines, but that the law violates the takings clause of the Fifth Amendment as applied to Panhandle under the circumstances of this case. The court will enter a declaratory judgment to that effect.

## Procedural History

Panhandle filed its original complaint on May 23, 1995, seeking preliminary and permanent injunctive relief. On May 25, 1995, Panhandle filed its motion for a temporary restraining order and amended the request in its complaint for preliminary and permanent injunctive relief. The court held a hearing with notice that same day on the application for a temporary restraining order. At the hearing, Juanita Morehead (also known as Jane Morehead) appeared by counsel and was granted leave to intervene as a defendant. Ms. Morehead owns farmland that would benefit if the Drainage Board carries out its proposed project, and her interests will be harmed if the project does not go forward. Because the imminence of the threatened harm was not clear at the May 25 hearing, the court took under advisement Panhandle's motion for a temporary restraining order and set a briefing schedule and hearing date for Panhandle's motion for a preliminary injunction. On May 31, 1995, Panhandle filed its Amended Motion for Temporary Restraining Order. That motion was not ruled upon and became moot.

On June 16, 1995, the court held a hearing on Panhandle's motion for preliminary injunction. The court received stipulated evidence [1] and heard testimony from Bradley Rayl, an engineer who has planned the project to reconstruct the John Dugan Drain. After hearing argument, the court issued an oral ruling denying Panhandle's motion for preliminary injunction on the basis that the threat of irreparable harm to Panhandle was not sufficiently imminent to warrant a preliminary injunction. The court stated that it believed prompt declaratory relief would be sufficient to protect Panhandle's interests in the event that Panhandle should prevail on the merits of its claims. However, the court said it would delay its ruling in order to provide an opportunity for the State of Indiana to file a brief on the constitutionality of Ind.Code § 36–9–27–48, and to provide other parties an opportunity to respond. The court also stated its intention to treat the factual record made at the preliminary injunction hearing as the factual record for purposes of a final judgment on declaratory relief, subject to the parties' rights to seek by July 10, 1995, permission to supplement the record. No party has asked to submit additional evidence. [2] Defendants have not answered the complaint but have moved to dismiss on the basis of arguments that will be addressed in this decision. Plaintiff filed on June 28, 1995, an amended complaint that makes clear it is seeking declaratory relief as well as injunctive relief. Accordingly, this matter is ripe for final judgment on the existing factual record.

## Findings of Fact

1. Plaintiff Panhandle Eastern Pipe Line Company is a Delaware corporation with its principal place of business in Houston, Texas. Panhandle operates transmission lines for natural gas from points of origin in Texas, Oklahoma, and Kansas, through Missouri, Illinois, Indiana, Ohio, and Michigan. Panhandle owns and operates four underground pipelines running through the State of Indiana; those pipelines are designated the 100 Line, the 200 Line, the 300 Line, and the 400 Line (collectively, "the Lines").

2. Defendant Madison County Drainage Board is a public body established by Ind.

---

1. The stipulated evidence consists of Exhibit 1—Engineering drawings showing Panhandle's pipelines as they would be affected by the proposed reconstruction of the John Dugan Ditch; Exhibit 2—Panhandle's Verified Motion for Temporary Restraining Order filed May 25, 1995, as verified by Burton G. Smith; Exhibit 3—Burton G. Smith Affidavit; Exhibit 4—William W. Grygar Affidavit; Exhibit 5—John C. Kelly Affidavit; and Appendix I (copies of Panhandle easements) and Appendix IV (Drainage Board documents) in the Appendix to Panhandle Eastern Pipe Line Company's Memorandum in Support of its Verified Application for Preliminary and Permanent Injunction.

2. The State of Indiana, as *amicus curiae*, submitted a reply brief that had attached to it unauthenticated copies of what appear to be 19th century court documents concerning the establishment of a regulated drain in Madison County. Because the court believed such documents would be highly relevant if they were admissible evidence concerning the establishment of the John Dugan Drain (see pages 1311–1312 below), the court delayed its ruling and offered the parties time to submit properly authenticated copies of the materials. No party has done so, and the State of Indiana has not explained what the documents are.

Code § 36–9–27–4. Its individual members are defendants Stephen E. Randolph, Gene Best, Doug Drake, Jeff Purdue, Ted Waymire, and Emley J. Hallgarth, who are all citizens of Indiana. Defendant Patrick Manship is the County Surveyor of Madison County, Indiana, and also a citizen of Indiana. Defendant Bradley A. Rayl Surveying and Engineering is a citizen of Indiana, and defendant Van Horn Excavating, Inc. is an Indiana corporation with its principal place of business in Fulton County, Indiana.

3. Panhandle's Lines run through the John Dugan Regulated Drain in Madison County. Panhandle owns easements and rights-of-way for its Lines running through the John Dugan Regulated Drain. Panhandle obtained those rights in 1936, 1943, and 1962. Panhandle's easements and rights-of-way are recorded in the Office of the Recorder of Madison County. Some of Panhandle's easements and rights-of-way were obtained through condemnation proceedings using the power of eminent domain.

4. Intervenor Juanita Morehead is a citizen of Indiana who owns farmland that would benefit if the John Dugan Drain is improved.

5. Engineers for the Drainage Board found that the John Dugan Drain was not adequate for its purpose: it could not carry measurable amounts of precipitation without the adjacent farmlands standing in water for long periods of time. In 1992, defendant Bradley Rayl Engineering submitted to the Drainage Board a proposal for repairing and improving the John Dugan Drain, including deepening and widening the drain. Pursuant to Ind.Code § 36–9–27–1 et seq., the Drainage Board has the authority to reconstruct and to widen such regulated drains and to assess the costs of such projects from the owners of the land that benefits from any such project. The statute specifies the procedures the Drainage Board must follow to approve such a project and to assess the costs from property owners.

6. On February 26, 1992, the Drainage Board held a public hearing on a petition to reconstruct the John Dugan Drain. The Drainage Board approved the petition.

7. The Drainage Board had issued prior written notice of the petition and hearing to affected property owners identified on the tax rolls, but did not give Panhandle prior written notice of the petition and hearing concerning the proposed reconstruction of the John Dugan Drain.

8. On May 24, 1995, after successfully defending the proposed project against challenges by other parties in the state courts, the Drainage Board planned to approve a contract with defendant Van Horn Excavating to carry out the proposed reconstruction of the John Dugan Drain for approximately $90,000. The filing of this suit has apparently delayed final approval of the contract, and the Drainage Board does not intend to give the contractor notice to proceed until this court decides whether Panhandle may be required to bear the cost of relocating its pipelines to accommodate the enlarged drain.

9. The Drainage Board's plans for reconstruction call for deepening the John Dugan Drain by 5 and ½ feet, and widening it by about 10 feet. If Panhandle's pipelines were not moved, enlarging the drain by this amount would expose and suspend in mid-air about 15 to 25 feet of three of Panhandle's pipelines, and would substantially reduce the amount of "cover" over the fourth line to as little as a few inches.

10. Safety requirements imposed by federal law require Panhandle to maintain a sufficient amount of "cover" on its underground pipelines. See, e.g., 49 C.F.R. § 192.327. Panhandle's 100 Line is 22 inches in diameter and is rated up to 760 pounds per square inch maximum allowable operation pressure (MAOP). The 200 Line is 24 inches in diameter and is also rated up to 760 pounds per square inch MAOP. The 300 Line is 30 inches in diameter and is rated up to 810 pounds per square inch MAOP. The 400 Line is 30 inches in diameter and rated up to 900 pounds per square inch MAOP.

11. Relocating or lowering the pipelines to comply with federal safety requirements would require an estimated eleven to twelve months to design the changes, obtain the necessary regulatory approvals, and carry out the work. Panhandle initially estimated the cost of such work was "likely to exceed"

$2,000,000. The most recent estimate provided to the court was $750,000. Despite this dramatic reduction in the cost estimate, it is clear that the cost of lowering four high pressure natural gas pipelines would be substantial. Regardless of the exact cost of lowering the pipelines, the cost is so substantial that if the Drainage Board is required to bear the cost of lowering the pipelines, the board cannot afford to go forward with the project.

12. On May 29, 1995, the Drainage Board sent written notice to Panhandle that the proposed reconstruction of the John Dugan Drain crossed the pipelines of Panhandle, and that the pipelines would interfere with the proper operation of the drain. The Drainage Board's letter stated that Panhandle would be required to lower its pipelines or to make some suitable arrangements to remove the impediment. The letter invited Panhandle to meet with Mr. Rayl to air any objections Panhandle might have. The letter was sent pursuant to Ind.Code § 36–9–27–48, which requires that such notice be given to public utilities, and which requires a public utility to pay the cost of relocating its equipment.

13. Before May 1, 1993, Panhandle offered a bundled gas sales service throughout its operating territory, including Indiana. Panhandle bought supplies of natural gas for resale to other pipelines, local gas utilities, and end users. Panhandle "bundled" this gas with the service of transporting, storing, and delivering the gas through its pipelines. Panhandle also offered "unbundled" gas transportation services for gas owned by others. However, FERC Order 636, issued by the Federal Energy Regulatory Commission, took effect on May 1, 1993. Pursuant to FERC Order 636, Panhandle has ceased its "bundled" gas merchant operations and no longer sells natural gas within the State of Indiana. Panhandle now limits its activities in Indiana to operation of a gas transportation and storage system with open access for gas owned by others.

14. Panhandle transports natural gas in interstate commerce. The rates, terms and tariffs under which Panhandle offers its gas transportation and storage services are regulated by FERC and not by any agency of the State of Indiana, including the Indiana Utility Regulatory Commission. Panhandle is not currently subject to regulation by the Indiana Utility Regulatory Commission with respect to its transportation or storage of natural gas. Panhandle operates its gas transportation and storage business under the authority of certificates issued and approved by FERC, and not under any certificates of authority from the Indiana Utility Regulatory Commission.

### Conclusions of Law

This court has jurisdiction over the parties and the subject matter. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1332, 1343, & 1367.

Panhandle has presented six distinct theories for blocking the proposed drainage project. Panhandle's principal arguments all challenge the Drainage Board's attempt to require Panhandle to lower its pipelines at its own expense. Panhandle argues (A) that it is not a public utility for purposes of Ind. Code § 36–9–27–48 ("Section 48") so that Indiana law does not authorize the Drainage Board to impose this burden on it. In the alternative, Panhandle argues that if Indiana law does impose this burden, the law violates Panhandle's federal constitutional rights by: (B) taking its property without just compensation; (C) imposing an unconstitutional burden on interstate commerce; and (D) denying it equal protection of the laws. Panhandle also claims (E) that federal law preempts the Drainage Board's power to act in this situation. In addition to these challenges to the substance of the Drainage Board's plans, Panhandle argues (F) that the Drainage Board cannot go forward with reconstruction of the John Dugan Drain because it failed to give Panhandle prior written notice of its February 26, 1992, hearing. In the amended complaint, Panhandle frames this issue in terms of a denial of due process of law, but its brief argues the issue in terms of a violation of the Indiana statute requiring prior written notice to each "owner of land affected by the reconstruction." Ind.Code § 36–9–27–52(a).

## A. The Scope of "Public Utility" Under Section 48

The Drainage Board has treated Panhandle like a public utility under Section 48 of the drainage chapter. Section 48 provides as follows:

(a) Whenever, in the construction or reconstruction of a regulated drain, the county surveyor determines that:

(1) the proposed drain will cross *a pipeline, cable, or similar equipment of a public utility;*

(2) the equipment will interfere with the proper operation of the drain;

he shall include in his plans the relocation requirements of the equipment. The surveyor shall, by registered mail, send a copy of the requirements to the public utility owning the equipment.

(b) If requested by the public utility, the county surveyor shall meet with the public utility at a time and place to be fixed by the surveyor and hear objections to the requirements. After the hearing, the surveyor may change the requirements as justice may require.

(c) If the board finds that the relocation of *a pipeline, cable, or similar equipment owned by a public utility* is necessary in the construction or reconstruction of a regulated drain, *the cost of relocation shall be paid by the public utility.*

Ind.Code § 36–9–27–48 (emphasis added). Panhandle denies that it is a "public utility" for purposes of Section 48. Panhandle points out that the drainage chapter does not define the term "public utility" and that the Indiana Code has no universally applicable statutory definition of the term. Panhandle does not offer any comprehensive definition of "public utility" as the term is used in Section 48. Panhandle contends only that, whatever that

definition might be, Panhandle should not be included. Panhandle urges the court to hold that the term does not apply to "federally regulated natural gas companies which are not subject to state utility regulation." Panhandle's statutory arguments are based heavily on its argument that applying Section 48 to it would be unconstitutional, especially as a taking of its property without compensation. The analysis must begin, however, with consideration of the statutory language, its context, and its purposes.[3]

The language of Section 48 does not resolve the issue, of course. But it is worth noting that both subsection (a)(1) and subsection (c) refer specifically to "a pipeline" of a public utility. Panhandle's pipelines appear to be precisely the type of physical obstacle that Section 48 was intended to reach. Also, there is nothing in the language of Section 48 that suggests Panhandle should not be included or that the definition reaches pipeline companies unless they are federally regulated and not subject to state utility regulation.

There is no universal definition of a "public utility" for purposes of Indiana law. The complex history of the legal status of natural gas pipelines provides the most relevant guide to interpreting Section 48 for these purposes. An accessible starting point for that analysis is the decision of the Supreme Court of Indiana in *Public Service Comm'n v. Panhandle Eastern Pipeline Co.*, 224 Ind. 662, 71 N.E.2d 117 (1947), in which the issue was whether the Public Service Commission could exercise jurisdiction over Panhandle's sales to large industrial consumers of gas in Indiana. The principal focus of the case involved the boundary between activities that were subject to exclusive federal regulatory jurisdiction and those over which the state could exercise jurisdiction. The Indiana court held that federal statutes allowed

---

**3.** Faced with two equally reasonable interpretations of a statute, courts generally adopt the interpretation that avoids a constitutional problem over one that creates such a problem. This principle has no application here because the interpretation Panhandle proposes does not affect the underlying constitutional issue. Whether the payment requirement in Section 48 violates the takings clause does not depend at all on the precise scope of the statutory term "public utility." Panhandle asks that Section 48 be in-

terpreted so that it does not apply to Panhandle (and Panhandle might be the *only* beneficiary of the proposed interpretation), not that Section 48 be interpreted in a way that renders it constitutional under Panhandle's view on the takings clause. The suggestion that the statute might not apply to Panhandle raises the issue of abstention, discussed below at page 1310, but does not implicate the canon of construction favoring the interpretation that renders a statute constitutional.

Indiana to exercise jurisdiction over the direct sales, and the Supreme Court of the United States affirmed. *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n*, 332 U.S. 507, 524, 68 S.Ct. 190, 199, 92 L.Ed. 128 (1947).

Along the way to the conclusion that the state could regulate Panhandle's sales, the Supreme Court of Indiana rejected Panhandle's argument that it was not a "public utility" for purposes of the Indiana statute defining the scope of the state commission's jurisdiction. The court relied in part on the statute defining a public utility as including every corporation that "may own, operate, manage or control any ... plant or equipment ... for the ... transmission, delivery or furnishing of heat, light, water or power ... either directly or indirectly to or for the public...." 71 N.E.2d at 127 (quoting § 54–105, Burns' Indiana Statutes Ann. (1933)). The court concluded that Panhandle was "unquestionably in the position of a public utility subject to regulation." *Id.* at 128. Although that was not the only statutory definition of a public utility, and although the precise question was not the same as that presented here, the 1947 decision treating this very company as a public utility for at least some purposes of Indiana law is a helpful guide.

In addition, Indiana law has treated Panhandle as a public utility for purposes of eminent domain, giving Panhandle the right to acquire easements, including some at issue here, through the sovereign's power of eminent domain. See Ind.Code § 8–1–8–1 (allowing "[a]ny public utility" engaged in "the production, transmission, delivery or furnishing of heat, light, water or power ... to appropriate and condemn lands of individuals ..."); Ind. Code § 32–11–3–1 (authorizing public utilities to exercise power of eminent domain). It would be incongruous to hold that the same company is a public utility for purposes of exercising the sovereign's power to condemn private property for public use, but is not a public utility for purposes of a statute that imposes upon the company obli-

gations closely related to its exercise of that power.

Thus, as a company owning and operating pipelines and selling gas directly to consumers in Indiana, subject to regulatory authority as a public utility, and exercising the powers of a public utility, Panhandle has been a public utility for many purposes of Indiana law. In the view of this court, therefore, at least apart from consideration of the effect of FERC Order 636, before 1993 Panhandle fell within the scope of the term "public utility" as used in Section 48.

Panhandle argues that the radical change in its business resulting from FERC Order 636 should take it out of the public utility category.[4] Panhandle would have the court interpret Section 48 so as include within the scope of "public utility" all gas companies that provide service to consumers in Indiana subject to state regulation, but to exclude from the definition companies that merely transport gas belonging to others.

This theory would build into the undefined term in Section 48 both a level of complexity and a prescience concerning future federal gas regulation that is not plausible as a matter of statutory interpretation. The structure of federal regulation of pipelines has nothing to do with the subject of Section 48 in the drainage chapter. Section 48 imposes certain obligations on companies that receive substantial privileges and benefits as part of a complex system of public regulation. The statute is concerned with equipment of public utilities that may interfere with drainage, and it specifically lists pipelines in the category of public utility equipment that could interfere with drains. That interference depends not a whit on the structure of federal pipeline regulation or on whether Panhandle is selling bundled or unbundled gas services. Both before and after FERC Order 636 took effect, Panhandle was and remains a regulated provider of gas transportation services. It has obligations to serve the public, and it has powers (such as the power of eminent domain) that help it serve the public. There is no reason why the 1993 change in federal

---

4. In arguing that it is not a public utility for purposes of Section 48, Panhandle has not raised, and this case does not squarely present, the interesting question whether Panhandle may continue to exercise the power of eminent domain under Indiana law.

regulation should also change Panhandle's status under Section 48.

■ The parties have not suggested but the court has considered the possibility that this court should abstain from deciding this question to allow the state courts an opportunity to determine whether, as a matter of state law, Panhandle is a "public utility" for purposes of Section 48. Under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), federal courts should abstain in some circumstances from deciding a novel question of state law when the law's interpretation could substantially affect a federal constitutional question. Several factors counsel against *Pullman* abstention here. First, the case has already gone to trial, and neither the parties nor the State as *amicus* have requested abstention. See *Serpas v. Schmidt*, 827 F.2d 23, 27 n. 2 (7th Cir.1987); *Mazanec v. North Judson–San Pierre School Corp.*, 763 F.2d 845, 847–49 (7th Cir.1985) (presumption against abstention, at least where neither party requested abstention before trial). But *cf. Waldron v. McAtee*, 723 F.2d 1348, 1351 (7th Cir.1983) (court has power and in appropriate case duty to order abstention even for first time on appeal and where parties have not requested it). Second, there is a serious issue of expense here. The expense of litigation in this case is likely to be roughly the same order of magnitude as the cost of the underlying drainage reconstruction project itself, and the parties all have an interest in prompt resolution of the constitutional issues here, especially the takings question.

■ Because of the considerations of comity at the heart of the *Pullman* doctrine, perhaps neither of those factors alone would be enough to avoid abstention. But an essential requirement for *Pullman* abstention is a reasonable chance that the statute can be narrowed by interpretation to avoid the constitutional issue. *Mazanec*, 763 F.2d at 847. The state statute must be "fairly susceptible" of an interpretation that would avoid the constitutional issue. *Kusper v. Pontikes*, 414 U.S. 51, 54–55, 94 S.Ct. 303, 305–306, 38 L.Ed.2d 260 (1973); *Harman v. Forssenius*, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965) (same); *City Investing Co. v. Simcox*, 633 F.2d 56, 60 (7th Cir.1980) (same). To justify abstention, there must be a significant possibility of a limiting construction. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984). In this case, Panhandle offers no coherent definition of "public utility" for Section 48; it simply wants the term to be construed to exclude Panhandle in order to avoid the alleged taking of its property without compensation. Essentially the only argument in favor of a "construction" of Section 48 to exclude Panhandle is that such a construction would avoid the constitutional issue. In light of the counsel from the above-cited authorities that the statutory language must be fairly susceptible of a constitutional construction, this is a very weak case for abstention. For abstention to make sense, the reasonable interpretation under state law should be an interpretation reached for reasons of state law. The court has therefore not abstained from deciding this statutory question concerning the scope of Section 48.

## B. Section 48 and the Takings Clause

■ Since FERC Order 636 does not remove Panhandle from the effects of Ind.Code § 36–9–27–48, the next issue is whether Section 48's requirement that the public utility bear the cost of relocating its equipment violates the Constitution of the United States. In another case involving Panhandle two generations ago, the Supreme Court held that a nearly identical requirement of Kansas law, as applied to construction of new highways across an established pipeline, would take property for public use without compensation in violation of the Fourteenth Amendment. *Panhandle Eastern Pipe Line Co. v. State Highway Comm'n*, 294 U.S. 613, 618, 55 S.Ct. 563, 565, 79 L.Ed. 1090 (1935) (the "Kansas highway case"). In that case, the Kansas Supreme Court had construed a Kansas statute to authorize the state highway commission to order Panhandle, at its own expense, to relocate its pipelines to accommodate new highways across Panhandle's established rights-of-way. There was no doubt that the highway construction would serve important public purposes, as would the re-

construction of the John Dugan Drain here, such as would surely allow the government to undertake the action. But the public purpose did not justify the imposition of costs on the pipeline company. 294 U.S. at 618–19, 55 S.Ct. at 565–66.

The Supreme Court distinguished a line of cases holding that railroads could be required to modify their lines at their own expense in order to accommodate new streets and highways. See *Erie R. Co. v. Board of Public Utility Comm'rs*, 254 U.S. 394, 410, 41 S.Ct. 169, 170, 65 L.Ed. 322 (1921); *Cincinnati, I. & W. Ry. Co. v. Connersville*, 218 U.S. 336, 343, 31 S.Ct. 93, 94, 54 L.Ed. 1060 (1910); *Chicago, Burlington & Q. Ry. Co. v. Chicago*, 166 U.S. 226, 250–54, 17 S.Ct. 581, 589–91, 41 L.Ed. 979 (1897). The Court reasoned that the railroads in those cases had posed a constant hazard to the public and had at least implicitly agreed to make reasonable changes to their equipment for purposes of public safety, but that Panhandle's pipelines did not present such a constant hazard and were not subject to any prior agreements or conditions requiring accommodation of future public improvements. 294 U.S. at 619–22, 55 S.Ct. at 566–67. The Court also distinguished *New Orleans Gas Light Co v. Drainage Comm'n*, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831 (1905), and other cases upholding the power of local governments to require pipeline companies to make changes in their lines. The Court found that in *New Orleans Gas Light* and similar cases, the pipelines had been laid with their owners' actual or implied agreements to make reasonable changes when directed by the local government. 294 U.S. at 622–23, 55 S.Ct. at 567–68. *Panhandle Eastern Pipe Line Co. v. State Highway Commission* may be old law, but it remains good law. Unless it can be distinguished on some relevant basis, it controls this case.

As *amicus curiae* defending the constitutionality of Section 48, the State of Indiana argued initially that Section 48 is constitutional because it is a regulation of land use that serves a legitimate public purpose and does not deprive the owner of so much value of its property as to render the regulation a taking. The realm of regulatory takings has been the focus a great deal of activity recently, see, *e.g., Dolan v. City of Tigard*, —— U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), but the State's argument here misses the point. Section 48's requirement that a public utility pay the cost of relocating its equipment to accommodate a drain is not merely a regulation of land use. It is backed up by the implicit but clear threat of actual physical intrusion and removal of the equipment. If the public utility simply refused to move its equipment, there is no doubt that Indiana courts would issue the orders necessary to allow public officials and their agents to take the physical steps needed to remove the public utility equipment. *E.g., Lake Erie & W.R. Co. v. Cluggish*, 143 Ind. 347, 42 N.E. 743, 745 (1896) (railroad had kept guards to prevent drainage contractor from removing railroad bridge; court affirmed injunction against railroad to prevent interference). Backed up by this kind of power, Section 48 cannot be treated as a mere regulation of use.

In a reply brief, the State of Indiana has suggested another basis for distinguishing the Kansas highway case. The State argues that the John Dugan Drain was established in the late 1800s, before Panhandle Eastern acquired any of its rights across that drain. The State points out that the Supreme Court's opinion in the Kansas highway case makes clear that the proposed Kansas highways were new highways that would cross Panhandle's existing pipeline rights-of-way. 294 U.S. at 617, 55 S.Ct. at 565. The Court also made clear that where a public utility has agreed, expressly or implicitly, to modify its equipment in the future to accommodate reasonable public needs, no compensation is necessary. 294 U.S. at 622–23, 55 S.Ct. at 567–68. See also *Tennessee Gas Transmission Co. v. Greater Lafourche Port Comm'n*, 293 F.Supp. 1019, 1023 (E.D.La.1968) (where pipeline owner had obtained authority to construct pipeline under shipping channel on condition that it would bear costs of moving the pipeline to accommodate later changes in channel, owner was not entitled to compensation for taking of private property), *reversed on other grounds and questioned on this*

*point on appeal, Tenneco, Inc. v. Greater Lafourche Port Comm'n,* 427 F.2d 1061, 1064 (5th Cir.1970).

Indiana law has long provided for public drains, and the prospect of reconstruction and expansion has always been present. See, *e.g., Brake v. Board of Comm'rs of Vigo County,* 2 Ind. 606 (1851) (early case involving drains); *Scott v. Stringley,* 132 Ind. 378, 31 N.E. 953, 954 (1892) (applying statutes for repair and reconstruction). The State argues that when Panhandle (or any predecessor in interest) acquired these easements and rights-of-way over and through the John Dugan Drain, it did so subject to the existing drain and the statutory power to reconstruct and expand it. When Panhandle built its pipelines, it had to decide how deeply to bury those pipelines. When Panhandle made those decisions, the State argues, it was on notice of at least the statutory power to expand and reconstruct the John Dugan Drain. If Panhandle did not bury its lines deeply enough to accommodate a reasonably foreseeable expansion of the drain, goes the argument, the cost of relocating the lines should be Panhandle's responsibility. Otherwise, the result of Panhandles's unilateral decisions about burying its lines would be that the other landowners in the watershed could not, as a practical matter, afford to reconstruct the drain in a way that otherwise would make economic sense. That is, Panhandle's later construction of those pipelines would allow Panhandle to impose significant costs on all other landowners in the watershed in the event of a reconstruction project. That obligation, resulting from Panhandle's unilateral actions, would substantially impair the value of the drain to other landowners in the watershed. Yet those other landowners (actually, their predecessors in interest when the drain was established and ever since) would have paid to build and maintain that drain for years prior to Panhandle's arrival on the scene.

■ The holding of the Kansas highway case and the constitutional requirement of just compensation do not apply to such a situation where the owner of private property has chosen to improve it in a way that is likely to interfere with the government's foreseeable use of property rights the government has already acquired (like an established public drain or highway right-of-way). See 294 U.S. at 622–23, 55 S.Ct. at 567–68 (distinguishing cases in which pipeline companies had agreed, at least implicitly, to modify their lines to accommodate needs of local governments). If Panhandle (or any predecessor in interest) was on notice, at the time it acquired its easements and rights-of-way across the John Dugan Drain, of both the existence of the drain and the possibility of reasonable modifications to that drain in the future, it should not be able to complain because a foreseeable modification of the drain requires it to bury its pipelines more deeply. Thus, if the John Dugan Drain was established before these easements and rights-of-way were acquired and before the pipelines were built, the Kansas highway case should not apply. The same distinction would apply to *Buckeye Pipe Line Co. v. Keating,* 229 F.2d 795, 798 (7th Cir.1956), where the Seventh Circuit held that a town could not build new streets over pipelines that had been built much earlier.

The State's theory is persuasive as a matter of law. The problem here is that there is no evidence to support it. The State attempted to support its argument by attaching to its reply brief copies of documents that the State describes as the documents creating the John Dugan Drain. They appear to be pages from the Order Book of the Madison Circuit Court from 1885, and they appear to report the court's actions on a "Petition for Drainage" filed by one Patrick Dugan. As Panhandle quickly pointed out in a short response to the court, however, such copies are not admissible evidence, and it is not clear whether the documents even deal with the same John Dugan Drain. Despite this belated and irregular attempt to offer such evidence, but because of the importance of the issue, the court provided an opportunity for the defendants to supplement the record by submitting properly authenticated documents to establish the point the State wanted to make. See Order of July 21, 1995. Panhandle quickly followed up with some pertinent discovery requests. The response to the court's Order of July 21, 1995, from defendants and the State has been silence.

The deadline for supplementing the record came and went, and the State has not tried to explain what was attached to its reply brief. Accordingly, there is no *evidence* supporting the State's suggestion that when Panhandle (or any predecessor in interest) acquired these easements and rights-of-way through Madison County, those rights were already subject to the John Dugan Drain and its possible expansion.

As a consequence, the court must conclude that this case is governed by the Kansas highway case. The Drainage Board wishes to serve an important public purpose by re-constructing the John Dugan Drain. It has the power to do so. Under *Panhandle Eastern Pipe Line Co. v. State Highway Comm'n*, however, it may not impose on a pipeline owner (or other public utility) the cost of moving its equipment, at least so long as the owner's rights existed before the drain was established. The cost of moving that equipment is a cost that the public must bear as a cost of the overall project. The Drainage Board has made it clear that the economics of this drain reconstruction project cannot support the cost of relocating Panhandle's pipelines. If that is so, the project must remain on the drawing board. The payment requirement in Section 48 is an unconstitutional taking as applied to Panhandle in this case.

## C. Interstate Commerce

Panhandle has raised other challenges to the requirement in Section 48 that the pipeline owner pay for relocation of its lines. Although this court finds that Panhandle is entitled to a declaratory judgment on the takings issue alone, the court will also address for the sake of the reviewing court Panhandle's other challenges to that requirement.

■ Panhandle argues that Section 48's requirement that a public utility whose equipment must be relocated must pay for the relocation violates the "dormant" commerce clause in Article I, section 8 of the United States Constitution. The requirement in Section 48 does not, as Panhandle concedes, discriminate against interstate commerce. The statute applies to pipelines, cables, and other public utility equipment regardless of whether the public utility operates only locally, only intrastate, or interstate. There is also no suggestion that the statute discriminates in practical effect against interstate commerce. See *CTS Corp. v. Dynamics Corp of America*, 481 U.S. 69, 87–88, 107 S.Ct. 1637, 1648–49, 95 L.Ed.2d 67 (1987); *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 505–06 (7th Cir.1989).

■ Panhandle concedes as much, but argues that Section 48 should be struck down on commerce clause grounds because it imposes an unreasonable burden on interstate commerce. Panhandle invokes the balancing formula from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970): "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." As often as this "*Pike* test" is cited, it is actually applied to invalidate laws in extremely rare cases. In fact, *Pike* itself involved a statute that discriminated on its face against interstate commerce by requiring that cantaloupes be packed in boxes before they could be shipped across a state line. 397 U.S. at 138, 90 S.Ct. at 845. In *Amanda Acquisition*, a case where the Seventh Circuit upheld a nondiscriminatory law in the face of arguments very similar to Panhandle's here, the Seventh Circuit referred to the "broader, all-weather, be-reasonable vision of the Constitution," and noted that although *Pike* "sometimes is understood to authorize such general-purpose balancing, a closer examination of the cases may support the conclusion that the Court has looked for discrimination rather than baleful effects." 877 F.2d at 505. With very few possible exceptions, the Supreme Court's decisions actually striking down state statutes on commerce clause grounds can be classified as involving either discrimination against interstate commerce as such, or laws that subject interstate commerce to an impermissible risk of inconsistent regulation. See *CTS Corp.*, 481 U.S. at 95, 107 S.Ct. at

1652 (Scalia, J., concurring in the judgment) (citing *Donald H. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091 (1986)). If one of those two categories is understood to include state laws that attempt to regulate commerce occurring wholly outside the legislating state, see, *e.g., Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989); *National Solid Wastes Mgmt. Ass'n v. Meyer,* 63 F.3d 652 (7th Cir.1995), those categories appear to account for essentially all the Supreme Court's modern decisions striking down state regulation of interstate commerce under the dormant commerce clause. Thus, unless one of these categories applies, the fact that a statute is inconvenient or expensive for those involved in interstate commerce, or requires them to change their preferred methods of doing business, does not render the statute violative of the commerce clause. See *CTS Corp.,* 481 U.S. at 93–94, 107 S.Ct. at 1651–52; *Exxon Corp v. Governor of Maryland,* 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978) (commerce clause does not protect "the particular structure or methods of operation in a ... market").

Section 48's requirement that the public utility pay the cost of moving its equipment does not fit into any of the problematic categories. It does not discriminate against interstate commerce, it applies only in Indiana, and it poses no risk of multiple and inconsistent regulation.[5] Section 48 may impose substantial costs on many businesses, including some engaged in interstate commerce, but

without more, the law does not violate the dormant commerce clause.

### D. Equal Protection

 Panhandle also contends that Section 48 violates the equal protection clause of the Fourteenth Amendment by singling out public utilities for unfavorable treatment. This argument adds nothing to Panhandle's takings argument. The general formula for analyzing equal protection clause claims is stated, among other places, in *City of Cleburne v. Cleburne Living Center Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985): "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest," but strict scrutiny applies if the law classifies on the basis of race, alienage, or national origin, or "when state laws impinge on personal rights protected by the Constitution."

Panhandle attempts to invoke "strict scrutiny" under the equal protection clause by claiming that Section 48 impinges on its "fundamental right" under the Constitution not to have its property taken for a public purpose without payment of just compensation. Although the general formulations by courts under the equal protection clause invite such a bootstrap argument, it is not necessary and adds nothing to the claim under the clause in the Constitution that provides the underlying "fundamental" right that is the predicate of the equal protection claim.[6] So it is here.

---

**5.** Regulations are "inconsistent" in this sense not when they are merely different, but when one regulating authority requires conduct that another regulating authority forbids, such that the regulated entity cannot comply with both. There is no apparent need for uniformity among the drainage laws of the several states.

**6.** The "fundamental right" prong of equal protection analysis seems to find its source in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), where the Supreme Court held that states' durational residency requirements for welfare benefits violated the constitutional right to travel and the equal protection clause. The majority opinion drew a dissent from Justice Harlan, who argued that question be decided under the implicit constitutional right to interstate travel, and that the majority's "fun-

damental right" analysis either added nothing to that right or invited broad expansion. *Id.* at 661–62, 89 S.Ct. at 1345–46 (Harlan, J., dissenting). This drew a concurring opinion from Justice Stewart arguing that the right to travel required the majority's result, and that the fundamental right prong did not "pick out particular human activities, characterize them as 'fundamental,' and give them added protection." *Id.* at 642–43, 89 S.Ct. at 1335–36 (Stewart, J., concurring). More recent cases have borne out Justice Stewart's approach, for the fundamental right prong of equal protection analysis has been aimed at rights to travel, rights to vote, rights of access to the courts, and rights of personal privacy that have been considered essential to, and at least implicitly protected by, the Constitution. Those decisions can be understood as protecting the essential right itself, without a need for in-

Panhandle's rights are protected by the takings clause. Section 48 does not violate the equal protection clause as applied to public utilities.

### E. Federal Preemption

■ In its opening brief, Panhandle asserted that the Federal Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, preempts the Indiana drainage statutes to the extent they might be applied to expose Panhandle's pipelines to the open air, to remove lateral and subjacent support (leaving the pipelines suspended in mid-air where they cross the drain), or to reduce the amount of "cover" over the pipelines. There is no conflict between state and federal law here, and therefore no preemption. Panhandle could comply with both state and federal law—it would just have to bury its pipelines more deeply in the vicinity of the John Dugan Drain. While requiring Panhandle to bear the cost of doing so violates the Fifth Amendment, Panhandle has pointed to no provision of federal law that would prohibit Indiana or local drainage boards from requiring Panhandle to rebury its pipelines so long as the state or local government is willing to pay the cost.[7]

### F. Notice Requirement

Independent of its substantive challenge to the Drainage Board's reliance on Section 48, Panhandle contends the Drainage Board's decision to approve the proposed reconstruction of the John Dugan Drain is invalid because the board failed to give notice to Panhandle as required by Indiana law. This argument requires a close examination of the statutory procedures for reconstructing and improving drains under Indiana law.

Under the Indiana statute on drains, the county drainage board may refer a regulated drain to the county surveyor for a reconstruction report. Ind.Code § 36–9–27–49(a).

The surveyor must then report on "the best and cheapest method of reconstructing the drain so that it will adequately drain all affected land." *Id.* The surveyor must include a cost estimate. The report must also include in the report:

> the name and address of each owner of land that will be affected by the proposed reconstruction, and the legal description of the land of each owner as shown by the tax duplicate or record of transfers of the county in which the land is located. However, a public way owned by a county or by the state shall be described by its name or number, and the right-of-way of a railroad may be described as the right-of-way of the owner through section, township, and range. If the name of an owner is not known, and cannot be discovered through diligent inquiry, the report may describe the land as belonging to the person who appears to be the owner according to the last tax duplicate or record of transfers of the county where the land is located.

Ind.Code § 36–9–27–49(d). When the local drainage board receives a surveyor's reconstruction report, the board must prepare a schedule of assessments listing each tract of land that will benefit from the reconstruction, the owner's name and address, and the board's assessment of the percentage of the total cost of the reconstruction that will be assessed against each tract of land, based on the benefit accruing to the land from the reconstruction. Ind.Code § 36–9–27–50(1). The drainage board must then determine the amount of damages to any owner that will result from the reconstruction. Ind.Code § 36–9–27–50(2). Then the surveyor must add expenses and damages to be paid as compensation to determine a total estimated cost of reconstruction, and the board must finally issue a schedule setting forth the amount of each owner's assessment for a portion of the total estimated cost of the

---

voking the equal protection clause. See, *e.g., Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972) (right to vote in state elections on equal basis with other citizens); *Sosna v. Iowa,* 419 U.S. 393, 409–10, 95 S.Ct. 553, 561–62, 42 L.Ed.2d 532 (1975) (right of access to courts to obtain divorce); *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (right to marry).

7. It is possible that a local government could try to compel a company in Panhandle's situation to move its pipelines in a specific manner or on a particular timetable that would not be consistent with federal law. This case presents no such issue.

reconstruction and each owner's annual assessment for estimated periodic maintenance costs for the reconstruction.

After the board has made these calculations and assessments, it must give notice and hold a public hearing. The issue here is whether the Madison County Drainage Board was required to give Panhandle notice of that public hearing. The notice requirement in Ind.Code § 36–9–27–52(a) requires a notice for "each owner of land affected by the reconstruction." *Id.* For each tract of land, the notice must include, among other information, the assessment that the owner must pay for the reconstruction cost, the estimated annual maintenance assessment, and any estimate of damage to the land. *Id.* The statute then provides a time for owners to object, and the statute then provides for a final decision by the board and judicial review of that decision. Ind.Code §§ 36–9–27–52(d), (h), (i), and –106. See 1995 Ind.Legis.Serv. P.L. 180–1995 (S.E.A.368), *reprinted in* Westlaw, IN LEGIS 180–1995 (amending Section 52).

Panhandle relies on the definitions section of the chapter to show that it was entitled to notice. The statute defines "affected land" as "land within a watershed that is affected by the construction, reconstruction, or maintenance of a regulated drain." Ind.Code § 36–9–27–2. "Owner" is defined as "the owner of any interest in land." *Id.* As Panhandle sees the issue, it owns easements and rights-of-way within the affected watershed, and these are "interests in land," so Panhandle was entitled to notice.

The court is not certain the issue can be decided by such reliance on labels. The notice requirement in Section 52 is directed primarily toward "owners" who may be assessed to pay for the reconstruction. The list of "owners" to be notified is to be compiled from tax records. See Ind.Code § 36–9–27–49(d). Under Indiana law, Panhandle's easements and rights-of-way are not subject to property tax by the local unit of government where they are located, but are instead taxed by the State Board of Tax Commissioners. See Ind.Code § 6–1.1–8–10(b); *Budnick v. Indiana Nat'l Bank,* 165 Ind. App. 457, 333 N.E.2d 131, 134–36 (1975) (tax sale of fee title after owner was delinquent in paying property taxes did not void pipeline companies' easements that were taxed separately).

On the other side of the argument, however, some Indiana cases hold, at least under earlier versions of the statute, that owners of easements and rights-of-way that benefit from a drain may be assessed to pay for the drain. *American Steel Dredge Works v. Board of Comm'rs of Putnam County,* 170 Ind. 571, 85 N.E. 1, 5 (1908); *Baltimore & O. & C.R. Co. v. Ketring,* 122 Ind. 5, 23 N.E. 527, 528 (1890); *Indianapolis & Cumberland Gravel–Road Co. v. State ex rel. Flack,* 105 Ind. 37, 4 N.E. 316, 317 (1886). In addition, the statutes governing drainage projects require the Drainage Board to estimate the damage the project will cause to any property "owner." Ind.Code § 36–9–27–50(2). Those estimates must be included in the overall cost of the project, and that overall cost becomes the basis for the assessments that are the subject of the required notice and public hearing. *Id.* Section 52 permits owners who will suffer damage an opportunity to object to the project and/or the damage estimate. These provisions might be applicable to some easement owners in some situations. In this case, however, there is no evidence suggesting that Panhandle would be affected by this reconstruction project other than in its capacity as a public utility—a matter addressed by Section 48.

As an owner of easements and rights-of-way, Panhandle could not be assessed any share of the cost of the reconstruction without notice. But no one seeks to assess Panhandle for any benefit here. As a party that would not be assessed to pay the costs of the reconstruction (at least in its capacity as owner of an easement or right-of-way), the notice that Panhandle says it should have been given would have done it no good under the statutory procedures. Thus, it is not at all clear that Section 52 should be interpreted to require notice of proposed drain reconstructions to owners of easements and/or rights-of-way who will not be assessed for any benefits from the project and who will not be damaged by the project. It may well be that the correct answer to the question

Panhandle poses can be found by a more detailed study of century-old statutes, but the court is reluctant to engage further in that study on a question of state law where the parties have provided little help and the plaintiff is entitled to more complete relief on other grounds. This court therefore leaves unanswered the question whether Section 52 required prior notice to Panhandle for this drain reconstruction project.

 To the extent that Panhandle claims that the Drainage Board's failure to provide it notice of the hearing violated its federal due process rights, that claim fails. Even where state law provides for notice and a hearing of some kind before the government takes action, and even where such notice and hearing makes eminently good sense by providing the government with more information and improving the quality of its decisions, the federal Constitution does not always require such procedures. The federal Constitution does not require a public body like the Drainage Board to give notice and a hearing to property owners who may be affected by what is essentially legislative action. A property owner whose property is targeted for taking by a public body does not have a federal constitutional right to participate in the legislative decision to take his property. *E.g., Joiner v. Dallas,* 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974), *summarily affirming Joiner v. Dallas,* 380 F.Supp. 754, 764, 769 (N.D.Tex.1974) (government may make legislative decision to condemn property without giving landowners notice and hearing on the question; later condemnation proceedings give owners all process that is due). Accord, *Joslin Mfg. Co. v. Providence,* 262 U.S. 668, 678, 43 S.Ct. 684, 688, 67 L.Ed. 1167 (1923); *Rindge Co. v. County of Los Angeles,* 262 U.S. 700, 709, 43 S.Ct. 689, 693, 67 L.Ed. 1186 (1923); *Bragg v. Weaver,* 251 U.S. 57, 58, 40 S.Ct. 62, 63, 64 L.Ed. 135 (1919); *Government of Virgin Islands v. 19.623 Acres of Land,* 536 F.2d 566, 570–71 (3d Cir.1976) (following *Joiner,* property owners not entitled by due process to notice and hearing on question whether land should be condemned for highway); *Tennessee Gas Pipeline Co. v. 104 Acres,* 749 F.Supp. 427, 430–31 (D.R.I.1990) (following "long line of decisions" holding notice and hearing not required). The case law establishes that a court proceeding to challenge the validity of the taking or the extent of compensation provides the process that is due under the federal Constitution. The same reasoning applies here. Panhandle's property interests could be protected sufficiently by a later court proceeding in its capacity as a public utility. This proceeding has provided Panhandle with that due process, and, for the reasons set forth above, Panhandle is entitled to relief from the proposed taking without compensation.

### Conclusion

Based on the evidence before the court in this case, the Kansas highway case, *Panhandle Eastern Pipe Line Co. v. State Highway Commission,* remains the governing law. The takings clause of the Fifth Amendment, as applied to the states through the due process clause of the Fourteenth Amendment, prohibits the defendants from requiring Panhandle to rebury its lines at its own expense to accommodate the proposed reconstruction of the John Dugan Drain. The court will issue a declaratory judgment reflecting this conclusion. The court sees no need for a permanent injunction to supplement the declaratory judgment.

So ordered.